IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LEROY WHITE, | : | CIVIL ACTION NO. |
| | : | 1:13-CV-1452-WSD-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **NON-FINAL REPORT AND** |
| CRYSTAL MOVER SERVICES, INC., | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Plaintiff Leroy White filed the Complaint in the above-captioned action on April 30, 2013. Plaintiff alleges that he is an African-American employee of Defendant Crystal Mover Services, Inc. ("CMSI" or the "Company"). He has asserted numerous claims against Defendant for race discrimination and retaliation, in violation of 42 U.S.C. § 1981. He alleges that he has suffered from a pervasive hostile work environment that has materially altered his conditions of employment on grounds of race and has suffered specific discrete acts of discrimination, including not receiving overtime, not being promoted, not receiving favorable assignments, and receiving unequal discipline.

The action is now before the Court on the Defendant's Motion for Summary Judgment [29]. The Court finds that Plaintiff has failed to show an actionable hostile work environment, and has failed to present sufficient evidence to establish several of the specific acts of discrimination or retaliation that he alleges, and that Defendant

is entitled to summary judgment on those claims. The Court finds, however, that Plaintiff has adduced sufficient evidence to show a genuine issue of material fact as to one of the discrete discrimination claims: the claim that he was denied a promotion in 2011 because of his race. Plaintiff shows that one of the key decision-making supervisors, even though also African-American, expressly stated that he felt Caucasian workers were superior to African-American workers. At around the same time, this supervisor contributed to the decision to promote a Caucasian worker to a position to which Plaintiff had applied. These and other facts should allow Plaintiff to reach a jury on this claim.

Thus, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED IN PART**, **DENIED IN PART**, and that judgment be entered in favor of Defendant on all claims presented in the Complaint except for Plaintiff's claim of race discrimination based on the Defendant's failure to promote him to an Engineer position in 2011.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from Defendant's "Statement of Facts" [29-2] ("Def. SMF"). The Court also draws some facts from Plaintiff's Response to Defendant's Statement of Material Facts [34] ("Pl. Resp. SMF"). Although Plaintiff has submitted a response to the Defendant's

Statement of Material Facts, he has not submitted a separate statement of additional facts that he contends are material and present a genuine issue for trial, as required by Local Rule 56.1.[1] *See* LR 56.1(B)(2)(b), NDGa (a respondent to a summary judgment motion shall include with the responsive brief both a response to the movant's statement of facts and "[a] statement of additional facts which the respondent contends are material and present a genuine issue for trial" which meets the requirements set out in Local Rule 56.1(B)(1)).

The Court has excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus.*

---

[1] Moreover, although Plaintiff has submitted a response to the Defendant's Statement of Material Facts, he has failed to state whether any of the Defendant's proffered facts are "disputed." Instead of stating which fact is "disputed," Plaintiff merely offers his own factual allegation, which in many instances does not controvert or dispute the Defendant's fact but merely includes additional information. *See, e.g.*, Pl. Resp. SMF at ¶¶ 4-5, 7-11, 26-28. The Court has endeavored to interpret Plaintiff's responses to discern which facts are in genuine dispute.

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

Defendant CMSI won a bid to operate and maintain the Automated People Mover ("APM") system built at the Atlanta Hartsfield-Jackson International Airport ("Atlanta airport" or "Atlanta site" or "site") in 2009. Def. SMF at ¶ 1. The first group was hired on or about June 1, 2009, when CMSI took over the site. Def. SMF at ¶ 2. The first group consisted of engineers and technicians who had been originally hired by Mitsubishi Heavy Industries of America ("MHIA") in early 2009, and who had already been working at the Atlanta site. Def. SMF at ¶ 3. According to Defendant, Plaintiff Leroy White was hired as part of this first group as a Technician and was promoted to the position of Lead Technician in July of 2009. Def. SMF at ¶ 4, n.6.

Prior to Plaintiff's employment with CMSI, he worked as a technician for a company called Westinghouse Air Brake Technologies ("Wabtec") that specialized in brake systems on trains. Def. SMF at ¶ 8. Plaintiff contends that he worked on brakes as well as the whole train system. Pl. Resp. SMF at ¶ 8. Around January or February 2009, Plaintiff, while working for Wabtec, was assigned to do work at the CMSI site because CMSI's APM system utilized Wabtec brakes. Def. SMF at ¶ 9. In

4

early May of 2009, Plaintiff applied at MHIA[2] and was interviewed by Bob Mihalco, Vice-President of Human Resources; John Champ, Vice-President of Operations and Maintenance; Alford McCarthy; and an MHIA representative. Def. SMF at ¶ 10. Plaintiff received an offer from MHIA to work as a Technician and began working in May 2009 at the Atlanta site for MHIA. Def. SMF at ¶ 11. On June 1, 2009, CMSI began to operate the site and Plaintiff was hired as a Technician by CMSI. Def. SMF at ¶ 12. Champ, Mihalco, and McCarthy made the decision to hire Plaintiff. Def. SMF at ¶ 13. During Plaintiff's employment with CMSI, all of his supervisors have been African-American. Def. SMF at ¶ 30; Pl. Resp. SMF at ¶ 30.

CMSI contends that it also hired the following employees in the first group along with Plaintiff: Alford McCarthy, Manager, Operations and Maintenance ("Site Manager") (African-American); Michael Marshall, Engineer, Operations and Maintenance ("Engineer") (African-American); Chad Perret, Lead Technician, Operations and Maintenance (Caucasian); Jimmy Manning, Lead Technician, Operations and Maintenance ("Lead Technician") (Caucasian); Sullivan Bailey, Lead Technician (African-American); Edward Austin, Lead Technician

---

[2] Plaintiff contends that he actually applied for a position with "LBT," but he does not identify LBT in his response to Defendant's Statement of Facts. Pl. Resp. SMF at ¶ 10. He further contends that he received an offer from LBT and began working at the Defendant's site in May of 2009. Pl. Resp. SMF at ¶ 11.

(African-American); and Hiroaki Isobe, Technician (Asian). Def. SMF at ¶ 4.

McCarthy had overall responsibility for running the site. Def. SMF at ¶ 4. According

to Defendant, Marshall was hired as an Engineer and was promoted to the position of

Senior Engineer in February of 2012, Perret was hired as Lead Technician and was

promoted to the position of Engineer in May of 2011, and Austin was hired as a

Technician and became a Lead Technician in June of 2010. Def. SMF at ¶ 4 n.4, n.5,

n.7. While Defendant refers to Plaintiff's position as a Technician and then a Lead

Technician,[3] Plaintiff contends that he was a "Qualified Maintenance Personnel" or

"QMP," the same position held by Perret, Manning, Bailey, and Austin. Pl. Resp.

SMF at ¶ 4.

CMSI contends that it hired the following employees as Technicians in the

second group on June 1, 2009: Tim Fox (Asian); Richard Josephus (Caucasian);

Reggie Frazier (African-American); Gus Bush (African-American); Dwayne Ghant

(African-American); Joseph Nelson (African-American); Odis Turk

(African-American); Edward Wolever (Caucasian); Stephen Rhodes (Caucasian);

Christopher Hite (Caucasian); and Frederick Hopkins (African-American). Def. SMF

at ¶ 5. According to Defendant, Bush was hired as a Technician and was promoted to

---

[3] According to Defendant, Plaintiff was hired as a Technician and was promoted
to Lead Technician on July 22, 2009. Def. SMF at ¶¶ 4 n.8, 18; *see* Pl. Dep. at 55-56
(Plaintiff testified that McCarthy promoted him to Lead Technician in July of 2009).

the position of Engineer in 2011, while Nelson was promoted to the position of Engineer in March of 2012. Def. SMF at ¶ 5 n.9, n.10. While Plaintiff does not dispute that these employees were hired as part of the second group, he contends that Tim Fox, who has a Japanese mother and white father, "looks white and refers to himself as 'Caucasian.'" Pl. Resp. SMF at ¶ 5.

Throughout the tenure of CMSI's Atlanta site operations, CMSI has contracted with a Company called Desmear to supplement staff. Def. SMF at ¶ 6. Those employees are referred to as DBE employees, and are not CMSI's employees. Def. SMF at ¶ 6. While there have been a number of DBE employees assigned to CMSI's operations, the relevant DBE employees are as follows: Matt Lowe (Caucasian never hired by CMSI); William Bray (African American subsequently hired by CMSI on January 4, 2010 as a Technician); Terry Dobbs (African American subsequently hired by CMSI on March 28, 2010 as a Technician); and Howard Philips (African American subsequently hired by CMSI on August 29, 2010 as a Technician). Def. SMF at ¶ 7.

On June 1, 2009, McCarthy asked Plaintiff to join the second group of hires in the classroom training. Def. SMF at ¶ 14. Defendant contends that Plaintiff underwent orientation with other new hires, going over the various policies in the employee handbook, including the absence reporting policy and the anti-harassment policy. Def. SMF at ¶ 15. Plaintiff disputes this and contends that there was no employee

handbook distributed at that time, and that Company policies were not reviewed with him at the orientation meeting. Pl. Resp. SMF at ¶ 15; Pl. Dep. at 45-46 (when asked whether Mihalco said anything about the employee handbook during the training, Plaintiff stated "I don't remember" but he stated he did not receive a handbook at that time and obtained one only later after asking another employee for a copy); Pl. Decl. at ¶ 7. Plaintiff was in the June 2009 classroom training for about four days, a week at most, until MHIA requested his help with one of the problem trains. Def. SMF at ¶ 16. After this, Plaintiff did not return to the classroom training, but continued with the testing of the system that he had been doing earlier with the City of Atlanta Engineers during his employment with MHIA. Def. SMF at ¶ 17. Plaintiff contends that he also performed repairs during this time. Pl. Resp. SMF at ¶ 17.

Employees were assigned to one of three shifts: first shift (6:00 a.m. to 2:30 p.m.), second shift (2:00 p.m. to 10:30 p.m.), or third shift (10:00 p.m. to 6:30 p.m.). Def. SMF at ¶ 20, n.11. On July 22, 2009, Plaintiff was promoted to the position of Lead Technician. Def. SMF at ¶ 18. Plaintiff did not apply for the position, and McCarthy informed him of his promotion. Def. SMF at ¶ 19. In October of 2009, McCarthy assigned Plaintiff to be the Lead Technician on the third shift, which performs mainly recovery and maintenance work. Def. SMF at ¶ 20; Pl. Resp. SMF at ¶ 20. An employee in "recovery" rides the trains or waits at the stations, basically

in position ready to retrieve or repair a train in distress. Def. SMF at ¶ 21. An employee in "maintenance" performs preventive maintenance work on the trains and performs other unexpected repair work that needs to be done. Def. SMF at ¶ 22; Pl. Resp. SMF at ¶ 22.

For all three shifts, a maximum of two employees per shift operated central control. Def. SMF at ¶ 23. An employee in "central control" works in the central control room using computer televisions and cameras to monitor for any problems or situations on the tracks and stations; the central control room is the heart of the operation. Def. SMF at ¶ 24. Because central control is crucial to handling the emergency situations that arise on the system, it is important that there are no distractions in the central control room. Def. SMF at ¶ 25. Defendant contends that, due to passenger demand and the number of trains running during the peak traveling hours, the third shift performs the most maintenance of all the other shifts, and requires the most employees to be scheduled. Def. SMF at ¶ 26. Plaintiff contends that the third shift maintenance employees do the same maintenance as the employees on the first and second shifts. Pl Resp. SMF at ¶ 26.

On third shift, as Lead Technician, Plaintiff was responsible for the same work as the Technicians on his shift as well as coordinating and assigning the work orders for the Technicians. Def. SMF at ¶ 27. Plaintiff contends that he was "in charge"

during this shift. Pl. Resp. SMF at ¶ 27. According to Defendant, the Plaintiff and the other Technicians on third shift would perform recovery work or maintenance work. Def. SMF at ¶ 28. Plaintiff claims that he and the other technicians on the third shift performed mostly maintenance work. Pl. Resp. SMF at ¶ 28. Plaintiff has performed the same job duties as a Lead Technician since 2009, though he moved from the third shift to the second shift in January of 2012. Def. SMF at ¶ 29.

Near the end of 2009, and again in 2010, Plaintiff complained to McCarthy about the way that Fox, Hite, and Wolever talked to the African-American employees, specifically that the three would raise their voices and speak in hostile tones. Def. SMF at ¶ 86. Plaintiff also contends that he complained to McCarthy again in 2013. Pl. Resp. SMF at ¶ 86. Hite and Wolever are Caucasian, while Fox is either Asian (according to Defendant) or Caucasian (according to Plaintiff). Def. SMF at ¶ 5; Pl. Resp. SMF at ¶ 5. Specifically, Plaintiff complained that one time Fox was speaking in a nasty tone over the radio and later confronted Plaintiff, claiming he was in charge because he was assigned to central control. Def. SMF at ¶ 87. Plaintiff testified that "it was nothing serious." Def. SMF at ¶ 87. In addition, on another occasion prior to 2010, Wolever raised his voice and grabbed Plaintiff's arm when Plaintiff and Wolever were discussing Plaintiff's instructions on how to do maintenance. Def. SMF at ¶ 88. Plaintiff also claimed that, in 2012 or later, Hite yelled over the radio at new

10

employees, although Plaintiff did not specify that he was the target of the rant. Def. SMF at ¶ 89.

Plaintiff also testified during his deposition that, in 2010, McCarthy told Plaintiff to "leave the white boys alone," in reference to Caucasian employees allegedly complaining to McCarthy about Plaintiff's sending two African-American employees to central control to train. Def. SMF at ¶ 84; Pl. Dep. at 136-39. Plaintiff testified further that, in or around February of 2011, during a shift meeting in the conference room attended by number of employees, including Plaintiff, McCarthy said, "the difference between a White worker and a Black worker, a [B]lack worker wants to work four hours and sit down for four hours …[A] white worker is a good worker. A White worker will work with you all day. He will help you in any way he can. He is a good worker." Def. SMF at ¶ 83; Pl. Dep. II at 53-55, Def. Ex. L.

Plaintiff further testified that, in 2011, McCarthy told him, Bush, and Hopkins that he was going to "break up this clique," and McCarthy accused Plaintiff of protecting Hopkins, a Technician on his shift. Def. SMF at ¶ 93. Plaintiff asked McCarthy what he was protecting Hopkins from, but McCarthy did not say. Def. SMF at ¶ 94. Plaintiff also asked McCarthy, "what is a clique?", but McCarthy would not tell him. Def. SMF at ¶ 94. Plaintiff also testified that he had heard McCarthy, who is African-American, accuse other African-American employees of stealing time. Def.

SMF at ¶¶ 95-96; Pl. Dep. at 193, 203-04. In 2011, Plaintiff also heard a Caucasian employee named "Lowe"[4] say, "y'all making too much money"; however, Plaintiff did not know who "y'all" was and did not ask Lowe. Def. SMF at ¶ 97. Plaintiff contends that Lowe made that statement to an audience comprised only of African Americans. Pl. Resp. SMF at ¶ 97. Plaintiff also heard Josephus and Rhodes complain to Marshall about overtime. Def. SMF at ¶ 98.

CMSI has an attendance policy in its employee handbook that requires employees who miss a scheduled shift to provide a doctor's note for absences related to personal illness, health related appointments, injury or disability, and requires employees to arrive to work on time and stay for their whole shift. Def. SMF at ¶ 31. CMSI enforces its no-fault attendance policy through the use of a point system. Def. SMF at ¶ 32. Employees who fail to provide a doctor's note when they miss a scheduled shift are assessed one point; employees who are fewer than 15 minutes late to work are assessed one-half of a point; and employees who are more than 15 minutes late to work are assessed one point. Def. SMF at ¶ 33.

In 2010, Plaintiff obtained a copy of the handbook and read it. Def. SMF at ¶ 34; Pl. Resp. SMF at ¶ 34. In August of 2010, CMSI reminded its employees of the

_____

[4] It is not clear whether "Lowe" is the DBE employee named Matt Lowe referred to by Defendant in Def. SMF ¶ 7.

attendance policy through a memorandum reviewing attendance policy questions and answers. Def. SMF at ¶ 35. On Thursday and Friday, November 4 and 5, 2010, Defendant contends that Company records reflect that Plaintiff did not come in to work as scheduled, did not submit a doctor's note excusing his absence, and did not take vacation time; instead, the records show sick days for Plaintiff on November 4 and 5, 2010. Def. SMF at ¶ 36. Plaintiff contends that he scheduled vacation time on November 4 and 5, 2010, which was approved by McCarthy, but that the vacation leave was mistakenly recorded as sick leave. Def. SMF at ¶ 194; Pl. Resp. SMF at ¶¶ 36, 194. On Thursday and Friday, November 18 and 19, 2010, Company records reflect that Plaintiff took a personal day and scheduled November 20, 2010 as a vacation day. Def. SMF at ¶ 37. On February 3, 2011, Plaintiff was eight minutes late for work due to an accident on the highway. Def. SMF at ¶ 38. On February 4, 2011, Plaintiff was one hour and 41 minutes late to work due to auto issues. Def. SMF at ¶ 39. On March 16, 2011, Plaintiff did not come in to work as scheduled due to illness and did not provide CMSI with a doctor's note for the absence. Def. SMF at ¶ 40.

In 2011, when it came to Mihalco's attention that employees were not being issued points for their attendance infractions, CMSI performed an attendance audit of its employees at the Atlanta site. Def. SMF at ¶ 41. After Akiko Yoshida, the Atlanta site Human Resources Administrative Assistant, reviewed Plaintiff's attendance

record, on May 31, 2011, Plaintiff was given one point for each absence on November 4 and 5, 2010; a half point for being late on February 3, 2011; one point for being late on February 4, 2011; and one point for being late on March 16, 2011. Def. SMF at ¶ 42. Plaintiff contends that CMSI conducted the audit and assessed points for the previous year only after he had filed a charge of retaliation with the Equal Employment Opportunity Commission ("EEOC"). Pl. Resp. SMF at ¶ 41. Plaintiff contends that he filed a charge of retaliation after he was assessed points for the two days of November 4 and 5, 2010, when he had prior approval for taking vacation leave. Pl. Resp. SMF at ¶ 42.

On March 19, 2011, Plaintiff did not come in to work as scheduled due to illness and did not provide CMSI with a doctor's note for the absence. Def. SMF at ¶ 43. On May 6, 2011, Plaintiff was 47 minutes late to work because he helped another employee who was having car trouble come to work. Def. SMF at ¶ 44. On May 18, 2011, Plaintiff left work early with a supervisor's approval due to a migraine but did not provide CMSI with a doctor's note for his early dismissal. Def. SMF at ¶ 45. After Yoshida reviewed Plaintiff's attendance record, on June 22, 2011, Plaintiff was given one point for his absence on March 19, 2011, one point for being late on May 6, 2011; and a half point for his early dismissal on May 18, 2011. Def. SMF at ¶ 46. Plaintiff never spoke with anyone at CMSI after receiving the second

14

disciplinary action for his attendance infractions. Def. SMF at ¶ 47; Pl. Resp. SMF at ¶ 47. The points Plaintiff received did not affect his pay or benefits in any way. Def. SMF at ¶ 48. Although Plaintiff does not dispute this, he contends that the points "counted towards termination" and that ten points "affected merit increase." Pl. Resp. SMF at ¶ 48.

According to Plaintiff, he never had an attendance problem. Def. SMF at ¶ 192. Plaintiff admits, however, that he came to work late on February 3 and 4, 2011, and May 6, 2011; did not come into work as scheduled and did not provide a doctor's note for the absences on March 16 and 19, 2011; and left work early with approval but did not provide a doctor's note for his early dismissal on May 18, 2011. Def. SMF at ¶ 193. Plaintiff claims that on February 3, 2011, the day he was eight minutes late for work due to an accident on the highway, all employees scheduled for his shift were late as well. Def. SMF at ¶ 195. It is undisputed, however, that CMSI does not have a record of a write-up for any other employees being tardy on that day. Def. SMF at ¶ 196.

Plaintiff also testified that other employees have left work early or taken sick days and did not provide a doctor's note for the absence and were not written up. Def. SMF at ¶ 199; Pl. Dep. at 214-15. It is undisputed, however, that Hite, Austin, Fox, Turk, Bailey, Turk, Josephus, Bray, and Phillips have all received points for not

15

coming to work for a scheduled shift because they were sick and did not provide a doctor's note for the absence. Def. SMF at ¶ 200. In 2011, this occurred to Hite on May 12; Austin on April 22; and Josephus on June 21. Def. SMF at ¶ 200. Austin has also received a point for leaving work early and not providing a doctor's note for the absence. Def. SMF at ¶ 201. Ghant, Nelson, and Fox have also received points for leaving work early. Def. SMF at ¶ 202. In 2011, this occurred to Nelson on June 27 and Fox on June 24. Def. SMF at ¶ 203.

On March 31, 2011, CMSI posted a memorandum to all employees that the Company would be creating two new Engineer positions, which would require "backup supervisory or managerial services," along with a "Bachelor's degree in Electrical or Mechanical engineering or equivalent experience required." Def. SMF at ¶ 49. Plaintiff saw the posting and submitted a cover letter, resume, and list of the training he had received since being at CMSI. Def. SMF at ¶ 50. Plaintiff, Hopkins, Frazier, Dobbs, Nelson, Austin, Fox, Hite, Rhodes, Bush, Perret, and Bray applied for the position. Def. SMF at ¶ 51.

Champ and Mihalco reviewed all the submissions, asking McCarthy, Yoshida, and Marshall for input, and decided on four individuals to interview: Bush (African-American), Perret (Caucasian), Bray (African-American), and Rhodes (Caucasian). Def. SMF at ¶ 52. Mihalco, Champ, and McCarthy interviewed all four

16

candidates by asking them the same questions, and then they discussed their answers and qualifications. Def. SMF at ¶ 54. There were a total of seven questions asked; the very first question was: "This position has 2 major responsibilities: technical support and supervision of employees. Describe your experience in these 2 areas." Def. SMF at ¶ 55. The other questions mainly focused on attributes related to the employee's technical backgrounds and leadership/supervisory attributes. Def. SMF at ¶ 56.

Champ, Mihalco, and McCarthy made the decision to promote Bush (African-American) and Perret (Caucasian) for the two Engineer positions. Def. SMF at ¶ 57. Bush was selected because he has a college degree and 23 years of experience working for MARTA, a similar transit system to CMSI, and while at MARTA he had several years of supervisory experience. Def. SMF at ¶ 59. Perret was selected because he has a Bachelor's degree in electrical engineering, nine years of experience in the engineering field, and was an assistant project manager for a year leading many other employees prior to coming to CMSI. Def. SMF at ¶ 58. According to Defendant, Plaintiff was not given an interview because he did not have supervisory experience like the other candidates chosen for an interview, and CMSI was not aware of Plaintiff's previous experience with MARTA. Def. SMF at ¶¶ 60, 235. Plaintiff contends that he did have supervisory experience because in his prior job, he had supervised 50 people, but he admits that his resume did not indicate any supervisory

17

experience. Def. SMF at ¶ 61; Pl. Resp. SMF at ¶ 61. He contends, however, that during his initial interview with CMSI, he informed Mihalco, Champ, and McCarthy that he had previous experience with MARTA. Pl. Resp. SMF at ¶ 235.

Plaintiff contends that, in 2009, McCarthy told him while they were both in the coffee room that "Miami wanted [his] skills for an Engineer position in Miami." Def. SMF at ¶ 225. Plaintiff contends that McCarthy told him that Champ wanted him in Miami; Plaintiff interpreted that to mean the position was his if he wanted it, but he told McCarthy he could not move his family to Miami. Def. SMF at ¶ 226; Pl. Resp. SMF at ¶ 226. Defendant contends that McCarthy was not authorized to offer Plaintiff a position in Miami, and that the Company never formally offered Plaintiff a position in Miami and. Def. SMF at ¶¶ 228-29. Plaintiff disputes this, and contends that McCarthy told him that Champ wanted Plaintiff for the Miami position and the position was his if he wanted it, but he told McCarthy that he did not want to move to Miami. Pl. Resp. SMF at ¶¶ 228-29. According to Plaintiff, he believed that the only common denominator between his offer in 2009 and CMSI's not offering him one of the Engineer positions in 2011 was McCarthy's involvement. Def. SMF at ¶ 227. Plaintiff believed that the "feedback from the local manager" was the reason he did not get the job. Def. SMF at ¶ 227.

Plaintiff admits that Bush and Perret were both qualified for the Engineer position. Def. SMF at ¶¶ 233-34; Pl. Dep. at 87-88. According to Plaintiff, he asked McCarthy why he did not get an interview in 2011, and McCarthy told Plaintiff because he "wasn't considered for the job." Def. SMF at ¶ 231. Defendant contends that all candidates were considered, and that Mihalco and Champ reviewed all the candidate's resumes and submissions in making the decision of who to interview of the positions. Def. SMF at ¶ 232. Plaintiff, on the other hand, contends that McCarthy told him that he would make the decision regarding which candidate to recommend to Champ. Pl. Resp. SMF at ¶ 232. After Plaintiff's initial discussion with McCarthy about not getting an interview, Plaintiff never discussed the decision to promote Bush and Perret to Engineers with McCarthy, Mihalco, or Yoshida. Def. SMF at ¶ 236.

On May 2, 2011, Plaintiff filed an EEOC charge alleging race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, which he later amended to include retaliation. Def. SMF at ¶ 62. CMSI received the first Charge of Discrimination in mid-to-late May of 2011. Def. SMF at ¶ 63. Since filing his EEOC charge, Plaintiff has received 3% merit-based raises on October 9, 2011; July 17, 2012; and July 14, 2013. Def. SMF at ¶ 64. Defendant contends that, when it received the charge, it was the first time the Company became aware that Plaintiff had felt that he had been subjected to discrimination. Def. SMF at ¶ 65. According to

Defendant, Plaintiff never complained to anyone at CMSI by phone, e-mail, letter, text, or voicemail that he felt the Company had discriminated or retaliated against him. Def. SMF at ¶ 66. Plaintiff disputes that and contends that he complained to McCarthy, the site manager. Pl. Resp. SMF at ¶ 66.

In July of 2011, Mihalco and Fumi Takashina, Supervisor of Compensation and Benefits, visited the site and conducted interviews of the following employees: Plaintiff, Dobbs, Bush, Marshall, Bray, Rudy Brown, Perret, Ghant, Hite, Fox, Nelson, Turk, Austin, Bailey, Josephus, Rhodes, Phillips, and Hopkins. Def. SMF at ¶ 62. Mihalco determined that there was no corroborating evidence that unlawful discrimination or harassment had taken place. Def. SMF at ¶ 68. Following the investigation, McCarthy was orally counseled for poor performance discovered during the investigation, specifically, employee relations, some inappropriate comments, and poor judgment when interacting with employees. Def. SMF at ¶ 69. McCarthy was subsequently given a disciplinary letter addressing the same issues. Def. SMF at ¶ 69; Mihalco Decl. [29-4] at ¶ 42, Ex. 6. On December 13, 2012, the EEOC issued a right to-sue letter to Plaintiff. Def. SMF at ¶ 70; Pl. Resp. SMF at ¶ 70.

On March 5, 2012, CMSI posted on a board in the hallway a memorandum to all employees that the Company would be filling one Engineer position, which would require "backup supervisory or managerial services," along with a "Bachelor's degree

in Electrical or Mechanical engineering or equivalent experience required." Def. SMF at ¶ 71. The position became available after Bush voluntarily left CMSI. Def. SMF at ¶ 72. Plaintiff saw the posting and submitted a cover letter, and the same resume and list of the training he had received since being at CMSI, in addition to a copy of certificates of relevant training he had completed at various institutions and employers. Def. SMF at ¶ 73. Plaintiff, Dobbs, Bailey, Nelson, Austin, Fox, Hite, and Bray applied for the position. Def. SMF at ¶ 74.

CMSI decided to interview all the candidates who applied in order to give each person an opportunity to share experiences they may not have included in their resumes that would demonstrate they met or exceeded the qualifications. Def. SMF at ¶ 75. Mihalco, Champ, McCarthy, Marshall, Yoshida, and Perret interviewed all the candidates, including Plaintiff, by asking the same questions that were asked in 2011, and then they discussed their answers and qualifications. Def. SMF at ¶ 76. Plaintiff remembers Mihalco asking him questions regarding supervisory experience, but Plaintiff does not remember what he said. Def. SMF at ¶ 77; Pl. Dep. at 92-93.

According to Defendant, the group made the decision to promote Nelson, who is African-American, for the Engineer position because he has an associate's degree in electronics, 28 years of electrical mechanic experience, and supervisory experience from his previous job. Def. SMF at ¶ 78. Defendant contends that Plaintiff was not

chosen because he still did not have a degree or possess the supervisory experience that CMSI required for the Engineer position, and he did not interview well. Def. SMF at ¶ 79. Although Plaintiff does not dispute that Nelson was chosen for the position over him, he contends that the reason Nelson was chosen was because Nelson had not filed an EEOC charge while Plaintiff had previously filed an EEOC charge against the Company. Pl. Resp. SMF at ¶¶ 78-79. On March 29, 2012, CMSI notified Plaintiff and the other applicants that they were not selected for the open positions, but they were welcome to submit their applications in the future. Def. SMF at ¶ 80.

Plaintiff admits that Nelson was qualified for the Engineer position, but he believed he was more qualified. Def. SMF at ¶ 241; Pl. Resp. SMF at ¶ 241; Pl. Dep. at 95. Plaintiff further contends that, when McCarthy offered him the Engineer position in Miami in 2009, McCarthy explained to Plaintiff that he had to transition from a Technician to a Lead Technician to an Engineer, but when Nelson was selected to be the Engineer in 2012 to replace Bush, Nelson had not been a Lead Technician. Def. SMF at ¶¶ 239-40.

According to Defendant, Mihalco asked Plaintiff during his interview if he had ever supervised any employees in a previous job and Plaintiff replied, "No." Def. SMF at ¶ 243; Mihalco Decl. at ¶ 46, Ex. 8. Plaintiff disputes that and contends that he had previously told Mihalco during his initial employment interview that he had

owned his own company and supervised over 50 employees. Pl. Resp. SMF at ¶ 243. Mihalco's March 20, 2012 notes regarding the interviews reflect that Plaintiff had previously owned a company but did not have any employees, and his high school diploma was the highest education he had obtained. Def. SMF at ¶ 243; Mihalco Decl. at ¶ 46, Ex. 8. Defendant further contends that, while Plaintiff had been a Lead Technician at CMSI, that is not a "supervisory" position. Def. SMF at ¶ 244. The position requires the coordination of work orders that are generated by the computer system running the APM, along with doing the regular duties of a Technician. Def. SMF at ¶ 244. The Engineer position, which supervises all Lead Technicians and Technicians on a shift, requires more independent thinking and supervisory skills than does the position of Lead Technician. Def. SMF at ¶¶ 245-46. While Plaintiff admits that the Engineer position requires more supervisory skills than a Lead Technician, he contends that Lead Technicians were expected to fill in for the Engineer and were expected to help, assist, and direct Technicians who had any problems. Pl. Resp. SMF at ¶ 244.

Plaintiff contends that African-American employees at CMSI were written up for performance violations when Caucasian employees would not be written up for the same violations. Def. SMF at ¶ 100; Pl. Dep. at 205. According to Plaintiff, Austin and Bray were written up for job performance while doing recoveries, while Fox and

Hite both destroyed equipment and were not written up. Def. SMF at ¶ 101; Pl. Dep. at 205. Plaintiff further testified that Hite caused damage to the system and was never written up, and Fox shut down the system on a number of occasions while doing recovery. Def. SMF at ¶ 102; Pl. Dep. at 205. Plaintiff testified that Bray was written up for unauthorized use of the computer, but Josephus would also do the same thing and was not written up for it. Def. SMF at ¶ 103; Pl. Dep. at 209.

Defendant contends that, according to Company records, Caucasian and African-American employees have been equally disciplined for all violations of Company policies. Def. SMF at ¶¶ 108, 115; Mihalco Decl. at ¶¶ 55-56, Ex. 11. Defendant contends that the only write-up Austin has received for behavior issues was on May 14, 2012, for performance issues related to operating central control, not doing recovery work. Def. SMF at ¶ 104. Defendant further contends that Bray has been written-up twice for behavioral issues: on May 10, 2012, for unauthorized use of the Company computer for personal use while on the clock, and on August 13, 2013 for performance issues related to operating central control, though these incidents did not involve recovery work. Def. SMF at ¶ 105.

Defendant further contends that it is unaware of any misconduct by Fox and Hite regarding destroying equipment, causing damage to the system, or shutting the system down. Def. SMF at ¶ 106. No write-ups for such misconduct are found in

either of their personnel files maintained by the Company. Def. SMF at ¶ 106. Plaintiff claims that he told Mihalco about Hite's "blowing up the transformer" and claims that Mihalco replied that he had heard it. Pl. Resp. SMF at ¶ 106. Defendant contends that it is also unaware of Josephus's unauthorized use of the Company computer for personal use while on the clock. Def. SMF at ¶ 107. According to Defendant, no write-ups for such misconduct are found in his personnel file maintained by the Company. Def. SMF at ¶ 107. Plaintiff contends that McCarthy was "standing right next to Josephus when he was surfing the web for porn – regularly." Pl. Resp. SMF at ¶ 107.

Plaintiff also testified that African-American employees were written up for attendance violations when Caucasian employees would not be written up for the same violations. Def. SMF at ¶ 109; Pl. Dep. at 194, 205. Plaintiff testified that Josephus, Lowe, and Hite had attendance problems. Def. SMF at ¶ 110; Pl. Dep. at 208. Because Lowe was not a CMSI employee, the Company does not have records of his attendance and did not discipline him for his attendance infractions. Def. SMF at ¶ 113. Josephus has been written up for attendance issues on six different occasions since working at CMSI, although, with the rolling system, Josephus has never had 10 points at one time, requiring dismissal. Def. SMF at ¶ 111. Plaintiff contends that he has personally observed Josephus being late five times in 2013 and clocking in late

over ten times in 2013. Pl. Resp. SMF at ¶ 111. It is undisputed that Josephus has not been eligible for a raise for the past two years because he acquired eight or more points at one time in those years. Def. SMF at ¶ 109; Pl. Resp. SMF at ¶ 109; Pl. Dep. at 210.

Defendant contends that Hite has also been written up for attendance issues on five different occasions since working at CMSI, although, with the rolling system, Hite has never had 10 points at one time, requiring dismissal. Def. SMF at ¶ 114. Plaintiff contends that he personally observed Hite coming in late an average of 2-3 times per month in 2009, 2013, and 2014. Pl. Resp. SMF at ¶ 114. Plaintiff testified that Bush, an African-American employee, would sign in for Lowe and Hite so they would not appear to be late in the Company records. Def. SMF at ¶ 116; Pl. Dep. at 211. According to Defendant, the Company was never made aware that Bush would sign in for Lowe or Hite. Def. SMF at ¶ 117. Plaintiff contends that McCarthy signed the time cards, even when Bush would "pencil in" the start times of Lowe and Hite, contrary to Company policy. Pl. Resp. SMF at ¶ 117.

It is undisputed that Plaintiff never complained to Mihalco, Champ, or Michio Koizumi regarding any of these allegations supporting his racially hostile work environment claim, other than the conversation Plaintiff had with Mihalco investigating his EEOC charge. Def. SMF at ¶ 118; Pl. Dep. at 129-130, 212. It is

undisputed that Plaintiff never told Mihalco, Champ, or Koizumi that he felt he was being discriminated against or harassed because of his race before or after the July 2011 investigation that was prompted by Plaintiff's filing his EEOC charge. Def. SMF at ¶ 119; Pl. Resp. SMF at ¶ 119; Pl. Dep. at 129-30.

CMSI has a problem-solving procedure in the employee handbook that requires employees to bring their problems to the attention of the Company through a series of Company representatives and, if an employee is not comfortable bringing his or her problems to the attention of a specific Company representative, he or she is required to proceed to a representative in a progressively higher position (immediate supervisor, Engineer, Manager, Vice-President of Operations and Maintenance (Champ), and (through the Vice-President of Human Resources (Mihalco)) the President and CEO of the Company. Def. SMF at ¶ 120. CMSI also has an unlawful harassment policy, which provides:

> [CMSI] is committed to maintaining a work environment that is free from unlawful discrimination and harassment. Unlawful harassment is any verbal or physical conduct that denigrates or shows hostility toward an individual on the basis of his/her protected class (i.e., race, color, religion, gender, age, national origin, ancestry, sexual orientation, religion, disability, marital status or veteran status), and that creates an intimidating, hostile, or offensive working environment. Unlawful harassment may include, but is not limited to epithets, slurs, jokes, or other verbal or physical conduct relating to an individual's protected class.

Def. SMF at ¶ 121; Mihalco Decl. at ¶ 62, Ex. 13.

> The unlawful harassment policy in the handbook also provides:
>
> If you believe you have experienced unlawful harassment, please notify your supervisor or your Human Resources representative immediately. If, for any reason, you do not feel that you can notify your supervisor or Human Resources representative, you must follow the "Problem Solving Procedure" as outlined in this handbook. [CMSI] will investigate all complaints and promptly apply appropriate sanctions designed to end any unlawful behavior that is determined to have occurred. . . . CMSI will not permit any retaliation against anyone reporting harassment, assisting in making a harassment complaint, or cooperating in a harassment investigation. Any employee who believes retaliation has resulted from the reporting of a complaint of unlawful harassment should report this immediately to the company's Vice President - Human Resources.

Def. SMF at ¶ 122; Mihalco Decl. at ¶ 63, Ex. 13.

Plaintiff never told Mihalco that he felt he was being discriminated against because of his race, other than when he discussed his EEOC charge with Mihalco. Def. SMF at ¶ 123; Pl. Resp. SMF at ¶ 123. Plaintiff never complained to Champ or Koizumi about harassment or discrimination. Def. SMF at ¶ 124. Plaintiff never complained to anyone in human resources that he felt he was being discriminated against because of his race. Def. SMF at ¶ 125. When Plaintiff was interviewed by Mihalco in July 2011, Plaintiff told Mihalco that he had no concerns about speaking openly with management. Def. SMF at ¶ 126. It is undisputed that McCarthy and

28

CMSI have never terminated anyone for reporting complaints to the Company. Def. SMF at ¶ 127.

During his deposition, Plaintiff testified that he believed that he had been denied overtime in 2011 because of his race. Def. SMF at ¶ 131; Pl. Dep. at 212-13. Plaintiff testified that, after McCarthy told Plaintiff that "overtime was going to stop," Caucasian employees continued to work overtime. Def. SMF at ¶ 132; Pl. Dep. at 131. He further testified that Caucasian employees were allowed to sit in central control while on the clock, making overtime. Def. SMF at ¶ 136; Pl. Dep. at 213.

During the start-up phase of the site from June 2009 through mid-2010, McCarthy approved overtime. Def. SMF at ¶ 138. Following that start-up phase of the site, the need for overtime dropped dramatically, and Champ instructed McCarthy that overtime needed to be reduced. Def. SMF at ¶ 139. On October 28, 2010, McCarthy had a meeting with the staff, including Plaintiff, to inform them that overtime opportunities would decrease and employees could no longer work overtime unless scheduled. Def. SMF at ¶ 140. Plaintiff contends that McCarthy told the entire third shift that "all overtime had to stop across the board" because Champ wanted to know "how much it costs to run the system." Pl. Resp. SMF at ¶ 140. A few months later, in January 2011, Champ sent McCarthy an e-mail that said overtime at the site was "off the charts" and there simply was no way such "excessive" overtime could

continue. Def. SMF at ¶ 141. The e-mail listed nine employees, who were both Caucasian and African-American, who worked a lot of overtime. Def. SMF at ¶ 142. Plaintiff claims that, a few weeks later, during a shift meeting in February or March of 2011, McCarthy told the staff there would be no more overtime worked. Def. SMF at ¶ 143; Pl. Dep. at 109.

In mid-2011, the Atlanta site switched to a seniority-based system of distributing overtime, through the use of a seniority matrix list. Def. SMF at ¶ 144. Although Plaintiff does not dispute that a "matrix system" was put into place for overtime, he contends that Perret told him that overtime would be rotated based on the list, but nothing was said about seniority. Pl. Resp. SMF at ¶ 144; Pl. Dep. at 119-20; Pl. Decl. at ¶ 25. According to Defendant, when there was an overtime opportunity, the Engineer on the shift would look at the matrix list and ask the employee who is at the top of the list if he was available to work, and the Engineer would move down the list until he found an available employee. Def. SMF at ¶ 145. The next time an opportunity arose, the Engineer on the shift would start on the list where the Engineer from the last time stopped; if the bottom of the list was reached, the Engineer would start again at the top. Def. SMF at ¶ 145. Plaintiff contends that, although Perret told

him that the system would work that way, it was not implemented that way and Hite, Lowe, and Fox continued to work overtime.[5] Pl. Resp. SMF at ¶ 145; Pl. Decl. at ¶ 26.

It is undisputed that Plaintiff was the Technician with the highest number of overtime hours in 2009 and the employee with the second highest number of overtime hours in 2010. Def. SMF at ¶ 147; McCarthy Decl. at ¶¶ 16-18, Ex. 3. It is also undisputed that, in 2011, Frazier, Dobbs, Phillips, and Ghant, all African Americans, were the employees with, respectively, the second, third, fourth and fifth highest number of overtime hours in 2011. Def. SMF at ¶ 148. Overall, the overtime hours worked by the Atlanta site employees dropped from 10,682.87 hours worked in 2010 to 4,812 hours worked in 2011. Def. SMF at ¶ 149.

Defendant contends that many overtime hours are worked during the third shift because only half of the system is being operated at that time, which allows for maintenance to be performed without interfering with the operation and availability of the system. Def. SMF at ¶ 150. Although Plaintiff does not appear to dispute this, he contends that "[a]ll QMP's on the Third shift are required to work the same number

---

[5] Although Plaintiff alleges that Hite, Lowe, and Fox continued to work overtime "almost exclusively," the record evidence he cites does not support that allegation. *See* Pl. Resp. SMF at ¶ 145; Pl. Decl. at ¶ 26. Plaintiff states in his Declaration that "[a]fter Mr. McCarthy told me about the overtime ban in 2011, I saw Tim Fox, Chris Hite and Matt Lowe working overtime, and I saw their timesheets when they left them around." Pl. Decl. at ¶ 26.

of hours as other QMP's on other shifts." Pl. Resp. SMF at ¶ 150. According to Defendant, the overtime that is worked during the third shift is worked by employees on the second shift (who stay late to work overtime if needed) and first shift (who come in early to work overtime if needed), and not by employees like Plaintiff on the third shift because it is their regular shift (not overtime). Def. SMF at ¶ 151. For employees like Plaintiff, who are scheduled to work third shift, overtime opportunities available to them on the third shift typically only occur on their days off from work. Def. SMF at ¶ 152. Plaintiff disputes this and contends that "Plaintiff as well as any other Third shift QMP would have opportunities to work overtime if there was an emergency–the same as any other QMP on any other shift." Pl. Resp. SMF at ¶ 152.

It is undisputed that Hite and Frazier worked on the second shift in 2011, while Ghant worked on the first shift in 2011. Def. SMF at ¶ 153. According to Defendant, Hite worked the most overtime in 2011 because the Atlanta site was experiencing problems with the daily recording and reporting system ("DRR") and the power distribution system ("PDS"), and Hite was one of the few individuals who had been trained by the MHIA Engineers to manually calculate the formulas the DRR completes, and Hite was considered an expert on the PDS. Def. SMF at ¶ 154; McCarthy Decl. at ¶ 24. Although Plaintiff does not dispute this, he contends that he also worked on the PDS, and McCarthy never told him that Hite was an expert on the

32

PDS. Pl. Resp. SMF at ¶ 154. He also claims that Hite worked mostly in central control and he "spent a large amount of time getting involved with Tim Fox and the other white QMP's filming and watching women in the Atlanta Airport performing compromising private acts." Pl. Resp. SMF at ¶ 155.

Plaintiff also admits he turned down overtime on a few occasions when he had a prior appointment, when he was asked at the last minute, or if he had a family emergency. Def. SMF at ¶ 155. Plaintiff claims that he turned down overtime "once or twice." Pl. Resp. SMF at ¶ 155; Pl. Dep. at 117-118 (Plaintiff testified that he turned down overtime "probably three times" in 2011, and probably "once or twice" in the years of 2012 and 2013). Plaintiff also admits he never talked to McCarthy about wanting to work more overtime at any point during his employment. Def. SMF at ¶ 156.

Plaintiff also testified that Caucasian employees were allowed to smoke cigars with McCarthy while on the clock. Def. SMF at ¶ 133; Pl. Dep. at 213. According to Plaintiff, McCarthy smoked cigars with Caucasian employees while they were working on overtime. Def. SMF at ¶ 73. Plaintiff testified that he never asked McCarthy to smoke cigars with him, that he does not even smoke cigars, and he was not sure if the other employees who smoked cigars with McCarthy were invited by McCarthy to smoke cigars or asked McCarthy. Def. SMF at ¶ 134; Pl. Dep. at 149.

After CMSI's July 2011 investigation, CMSI banned smoking cigars on Company time. Def. SMF at ¶ 135. Plaintiff contends, however, that Fox and Hite continued to smoke cigars inside the maintenance bay until 2014. Pl. Resp. SMF at ¶ 135.

Plaintiff also claims that all the Caucasian employees worked in central control and did not have to do heavy maintenance. Def. SMF at ¶ 160. According to Defendant, both Caucasian and African-American employees were central control operators from 2009 through the present. Def. SMF at ¶¶ 161-62; McCarthy Decl. at ¶ 25, Ex. 4. Defendant contends that both Caucasian and African-American employees who were not working in central control were working recovery and maintenance, which require employees to work in the shop, ride the trains, or be at the stations. Def. SMF at ¶ 163. Plaintiff contends that a disproportionate number of whites were in central control while a disproportionate number of African Americans were in maintenance. Pl. Resp. SMF at ¶ 163. Plaintiff further testified that McCarthy instructed Plaintiff to stop sending Austin and Frazier to train in central control. Def. SMF at ¶ 166.

Plaintiff also testified that three Caucasian employees were pulled out of the June-August 2009 classroom training to train in central control, while Plaintiff was not put in central control. Def. SMF at ¶ 167; Pl. Dep. at 216. Defendant contends that, as the classroom training progressed, the following individuals were pulled out

of the classroom training by MHIA to do specialized on-the-job training in various areas: Tim Fox, who left the classroom training early to get more specialized training on the communication systems; Odis Turk, who left early to get more specialized training to be a central control operator; Chris Hite, who left early to get more specialized training on the Power Distribution System ("PDS"); and Edward Wolever, who left early to get more specialized training to be a central control operator. Def. SMF at ¶ 169. Plaintiff disputes this and contends that Turk never went to central control during this time period, and that Hite worked almost exclusively in central control and the PDS system is not located in central control. Pl. Resp. SMF at ¶ 169; Pl. Dep. at 42-43; Hopkins Decl. at ¶ 2; Austin Decl. at ¶ 7.

Austin, Perret, Bailey, Sheppard, and Manning never went to the classroom training, but remained working on the site doing the testing required by the City of Atlanta. Def. SMF at ¶ 170. According to Defendant, Japanese Engineers from MHIA were still on the site during the testing and commissioning stage, and they selected the individuals to train in central control. Def. SMF at ¶ 171. Plaintiff disputes this and contends that McCarthy made the selection. Pl. Resp. SMF at ¶ 171. According to Defendant, Plaintiff had already been pulled out of training early to work on a problem train for CMSI, when he saw other employees pulled out early for central control training. Def. SMF at ¶ 168. Plaintiff disputes this and contends that he was

35

told to sit in on the class when he had time, and that he was working on the train as part of his assigned duties before the class and he was needed to finish the job. Pl. Resp. SMF at ¶ 168.

After Plaintiff filed his EEOC charge in 2011, Mihaco investigated Plaintiff's claims, and, during his interview with Plaintiff in July of 2011, Plaintiff said he had been given the opportunity to cross-train in central control. Def. SMF at ¶¶ 157, 175. Plaintiff admits this, but contends that he was given the opportunity to cross-train in central control only after he filed an EEOC charge. Pl. Resp. SMF at ¶¶ 157, 175. Following the 2011 investigation, Mihalco became aware of a number of employees who wanted to train in central control and told McCarthy that more employees needed to be trained in central control. Def. SMF at ¶ 176. A few months after the 2011 investigation, Plaintiff started receiving additional training in central control and, in 2013, was certified and started working in central control. Def. SMF at ¶ 177.

In 2010, a central control operator spot became available, and McCarthy instructed Hite to pick someone to fill in the spot; Hite picked Kashad Johnson, an African-American, to be the central control operator.[6] Def. SMF at ¶ 178. Plaintiff

---

[6] While Defendant claims that this position was on the second shift, Plaintiff contends that it was actually on the third shift; neither party cited to evidence in the record indicating which shift Johnson worked as the central control operator. *See* Def. SMF at ¶ 178; Pl. Resp. SMF at ¶ 178; Pl. Dep. at 159-60.

testified during his deposition that Johnson started working in central control in 2010, and that Turk, another African-American, regularly worked in central control throughout 2012. Def. SMF at ¶¶ 179-80. Plaintiff also testified that Austin, another African-American, worked in central control, although he could not recall the time period. Def. SMF at ¶ 181. According to Plaintiff, Austin worked in central control over after he sustained a knee injury and had to be placed on light duty, and the only light duty was in central control. Pl. Resp. SMF at ¶ 181. Plaintiff further testified that Nelson, an African-American, worked in central control in 2010 after he requested the assignment from McCarthy. Def. SMF at ¶ 182. Plaintiff also testified that Ghant, an African-American, worked in Central Control prior to January of 2012. Def. SMF at ¶ 183.

Plaintiff testified that he asked McCarthy to work in central control sometime in 2010 and McCarthy responded that CMSI was going to train everybody. Def. SMF at ¶ 185. When McCarthy did not follow up with Plaintiff's request, Plaintiff never asked McCarthy again about central control. Def. SMF at ¶ 186. As a result of CMSI's investigation of Plaintiff's claims, all Technicians were trained in central control and are now rotated in that position. Def. SMF at ¶ 184. Plaintiff received further training in central control following CMSI's investigation of his EEOC charge. Def. SMF at ¶ 187. Defendant contends that, prior to that time, CMSI did not have a business need

to have Plaintiff work in central control, since there were already enough central control operators and Plaintiff was doing a good job with his duties. Def. SMF at ¶ 188. Turk, Nelson, Johnson, Ghant, and Austin, all African-American employees, all trained other employees in central control, and Plaintiff never requested training from Johnson, Turk or Nelson. Def. SMF at ¶¶ 189-90. Although Plaintiff does not dispute this, he contends that neither Ghant nor Austin was in central control prior to the Plaintiff's filing an EEOC charge in 2011, and he further contends that he did not have the authority to "bypass" McCarthy and request training when McCarthy was aware of his request. Pl. Resp. SMF at ¶¶ 189-90.

Plaintiff contends that at some point around August through September 2011, January 2012, and May through July 2012, he was not permitted to clock in to work up to 15 minutes early and be paid for those minutes because of his race. Def. SMF at ¶ 204. Plaintiff testified that this happened "quite a few times." Def. SMF at ¶ 204. According to Plaintiff, sometime in 2011 he went to speak to McCarthy about concerns he had that his clock-in times were being changed to not reflect the 15 minutes he had clocked in early. Def. SMF at ¶ 205. Plaintiff testified that McCarthy told Yoshida to change Plaintiff's clock-in times because his shift starts at 10:00 p.m. Def. SMF at ¶ 205. Plaintiff testified he said nothing more to McCarthy after McCarthy told him what he was having Yoshida do. Def. SMF at ¶ 206. According

38

to Plaintiff, he believed Dobbs and Hopkins had the same problem with their time cards. Def. SMF at ¶ 207.

Plaintiff further claims that both Fox and Hite were able to clock in up to 15 minutes early and were paid for it. Def. SMF at ¶¶ 209, 211. Plaintiff claims to know this because he saw the time sheets of Fox and Hite, although he cannot remember the date or month he saw them. Def. SMF at ¶¶ 210, 212. It is undisputed that, from August of 2010 through all of 2011 and from May of 2012 through July of 2012, Plaintiff clocked in up to 15 minutes early and was paid for it on 62 days. Def. SMF at ¶ 213. It is further undisputed that Fox and Hite both clocked in up to 15 minutes early and were paid for it on 45 and 41 days, respectively. Def. SMF at ¶ 213. In addition, on some occasions during this time period, CMSI changed the clock-in times for Plaintiff (160), Fox (154), and Hite (213) from their clock-in time to the exact time their shift started in order to reflect when they were to begin working, in accordance with Company policy. Def. SMF at ¶ 214. Plaintiff does not dispute this, but he claims that Fox and Hite continued to receive overtime pay after McCarthy said there would be no more overtime. Pl. Resp. SMF at ¶ 214.

During the time period raised by Plaintiff, August of 2010 through all of 2011 and May 2012 through July 2012, as a general rule, if an employee clocked in between seven and fifteen minutes early for his or her shift, the employee would be paid an

extra $0.25 an hour. Def. SMF at ¶ 215. Sometime around October 1, 2011, CMSI posted a notice above the time clock instructing employees to not punch in more than 15 minutes earlier than their start time. Def. SMF at ¶ 217. On November 14, 2011, CMSI posted a memorandum to the employees stating that employees are not allowed to clock in more than 15 minutes early at the start of their shift and that, even if employees clock in up to 15 minutes before their shift, they should not start working until their scheduled start time and must stop working at their scheduled end time and will only be paid for the actual hours they worked. Def. SMF at ¶ 218. The memorandum also states that it was being implemented because the results of a recent audit demonstrated that early clocking-in was causing "a significant impact on the budget" of the site. Def. SMF at ¶ 218.

Plaintiff admits that he read the memorandum when it was posted. Def. SMF at ¶ 219; Pl. Resp. SMF at ¶ 219. Plaintiff testified that he understood the memorandum to mean that if he were scheduled to start at 10:00 p.m. and he clocked in at 9:46 p.m., he would not be paid from 9:46 to 9:59 p.m. Def. SMF at ¶ 220. Plaintiff further admitted that, prior to the memorandum being posted, McCarthy personally told Plaintiff and other employees during a shift meeting in early 2011 that they would not be paid for their early clock-in times. Def. SMF at ¶ 221. Also in 2011, Yoshida made a presentation to all the employees during a site-wide meeting in the

conference room when she explained that employees would only be paid for their scheduled time. Def. SMF at ¶ 222. Plaintiff was present at the meeting and remembered the PowerPoint Yoshida presented that contained the clock-in instructions. Def. SMF at ¶ 222. On May 29, 2013, CMSI sent another memorandum to its employees reminding them that they may clock in up to 15 minutes before their shift start time, but they will only be paid for their scheduled hours due to budgetary constraints, unless they receive approval for those early or late minutes. Def. SMF at ¶ 223.

It is undisputed that, other than the disciplinary action described above in 2011 (when Plaintiff was assessed points for unexcused absences and early dismissals), Plaintiff has not received any disciplinary action since CMSI learned about the filing of his EEOC charge. Def. SMF at ¶ 248. Plaintiff admits that he never contacted Mihalco, Champ or Koizumi regarding any complaints after the July 2011 investigation that was prompted by Plaintiff's filing his EEOC claim. Def. SMF at ¶ 250. As of the time that Defendant filed its Motion for Summary Judgment, Plaintiff was still employed with CMSI. Def. SMF at ¶ 248.

41

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of

42

a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

## B.    DEFENDANT'S NOTICE OF OBJECTION

In connection with his response to the Defendant's Motion for Summary Judgment, Plaintiff submitted his Declaration and the Declaration of Frederick Hopkins, a co-worker at CMSI. *See* Pl. Decl. [34-2], Hopkins Decl. [34-3], attached to Pl. Resp. [34] as Ex. A and B. Defendant has filed a "Notice of Objection to the Declarations of Plaintiff and Frederick Hopkins" [36] in which it argues that certain portions of the declarations must be excluded from consideration by the Court because the testimony is not based on personal knowledge, directly contradicts the affiant's previous sworn testimony, or because it is inadmissible on the basis of another evidentiary objection.

In creating an issue of fact, a party may not rely on an affidavit from an individual that directly contradicts his or her own deposition testimony. An affidavit

may be considered a "sham" affidavit "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"). A court presented with such an inconsistency in a party's testimony may disregard the later "sham affidavit" in favor of the earlier deposition testimony. *Tippens*, 805 F.2d at 949; *see also Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1373 (S.D. Ga. 1993).

This "sham affidavit" rule, however, as set forth in this Circuit and elsewhere, operates to nullify only *unexplained* variations in testimony. *See Van T. Junkins & Assoc.*, 736 F.2d at 656 ("a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony *without giving any valid explanation*.") (emphasis added); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). When the witness furnishes a credible

45

explanation for his reversal, courts are properly unwilling to discard the revised testimony as a sham. *See, e.g.*, *Pries v. Honda Motor Co.*, 31 F.3d 543 (7th Cir. 1994) (declining to discard affidavit as sham because plaintiff credibly explained variation in testimony based on later understanding of events); *Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672 (N.D. Iowa 1995) (finding no sham because medical expert witness gave reasonable explanation for revised opinion presented in affidavit).

Furthermore, the Eleventh Circuit has cautioned courts that, in reviewing affidavits submitted in connection with a motion for summary judgment, an affidavit may not be simply disregarded as a "sham" because it contains information contradictory to other evidence in the record.

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (*quoted in Tippens*, 805 F.2d at 954).[7]

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

In light of these considerations, the Court concludes that the Declarations are not "sham" affidavits that must be disregarded by the Court entirely. For that reason, the Defendant's Objection is **OVERRULED**. The remainder of the Defendant's arguments in its Notice of Objection involves issues of credibility, impeachment, and the weight that the testimony should be given, all of which are the province of the factfinder and not the Court. "Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact." *Tippens*, 805 F.2d at 954.

C.      STANDARDS OF PROOF UNDER 42 U.S.C. § 1981

Plaintiff has asserted claims of race discrimination and unlawful retaliation against Defendant CMSI under 42 U.S.C. § 1981 ("§ 1981"). *See* Compl. at ¶¶ 22-30. The statute provides as follows:

**(a) Statement of equal rights**

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

 For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

47

**(c) Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

It is well-settled law that § 1981 prohibits race discrimination in both the public and private employment context. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts."); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). To establish a claim of race discrimination under Section 1981, a plaintiff must establish that: (1) the plaintiff was a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See White v. Fla. Highway Patrol, Div. of Fla. Dep't of Highway Safety*

*& Motor Vehicles*, 928 F. Supp. 1153, 1157 (M.D. Fla. 1996) (citing *Milan v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993)).

Furthermore, in cases in which a plaintiff has asserted a claim under § 1981 as a remedy for employment discrimination, the elements required to establish a claim under § 1981 mirror those required for a claim brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq. See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (*citing Patterson v. McClean Credit Union*, 491 U.S. 164 (1989)); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991). In this case, the parties appear to agree that Plaintiff's claims of race discrimination and retaliation under § 1981 should be analyzed under the same analytical framework as claims brought under Title VII. *See* Def. Br. [29] at 3 (citing cases applying the law under Title VII); Pl. Br. [35] at 5. n.4 (noting that the same standards should be applied for claims brought under § 1981 as under Title VII).

In general, to prevail on a claim of race discrimination under Title VII or § 1981, a plaintiff must prove that the defendant acted with discriminatory intent.

*Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Additionally, statistical proof may also be used as circumstantial evidence to establish intent. *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks the intent of which could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of

an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

51

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate

the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

### D.   PLAINTIFF'S CLAIMS OF RACE DISCRIMINATION

Plaintiff has asserted a claim of race discrimination under § 1981 against his employer, Defendant CMSI. Plaintiff argues in his brief that Defendant discriminated against him because of his race in several different ways. He argues that the Defendant created and maintained a racially hostile work environment for the Plaintiff and other African-American employees. He argues further that Defendant discriminated against him because of his race when it denied him the opportunity to work overtime, when

53

it failed to train him to work in central control, and when it failed to promote him to an Engineer position. The Court will address each of these separate allegations of race discrimination individually.

       1.   *Hostile Work Environment*

Plaintiff alleges that Defendant violated § 1981 when it created a hostile work environment on the basis of Plaintiff's race. An employer is liable for racial harassment in the workplace when the harassing conduct "unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65 (1986). In order to establish a *prima facie* case of a racially hostile work environment, a plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903-905 (11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must show that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). In evaluating whether a reasonable person would find conduct to be sufficiently severe or pervasive, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner*

55

*Offshore Services, Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*) ("courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

In this case, it is undisputed that Plaintiff is African-American, and he alleges that he was subjected to unwelcome acts of harassment based on his race. Plaintiff alleges that the Site Manager Al McCarthy, who is African-American, created and maintained a hostile work environment for the other African-American employees. Although Plaintiff admits that the majority of Technicians at CMSI are African-American, and that McCarthy is African-American, he contends that McCarthy treated the few white employees better than he treated the other African-American employees. *See* Pl. Br. at 1-2. Defendant argues that, even if the Plaintiff had been subjected to a few instances of racially motivated comments or other acts of "harassment," the incidents were not sufficiently severe or pervasive to create a hostile work environment that would be actionable as a claim of race discrimination under § 1981. The undersigned agrees, and finds that Plaintiff has failed to establish a *prima facie* case of a hostile work environment based on his race.

Plaintiff cites to the following incidents as evidence of the alleged hostile work environment. He alleges that certain white employees–Fox, Hite, and Wolever–would speak to him and other African-American employees in hostile tones and would raise their voices. Def. SMF at ¶ 86. He contends that he complained about this to McCarthy in 2009 and 2010, and again in 2013. Def. SMF at ¶ 86; Pl. Resp. SMF at ¶ 86. Specifically, Plaintiff complained that one time Fox was speaking in a nasty tone over the radio and later confronted Plaintiff, claiming he was in charge because he was assigned to central control. Def. SMF at ¶ 87. Plaintiff admits, however, that "it was nothing serious." Def. SMF at ¶ 87. In addition, on another occasion prior to 2010, Wolever raised his voice and grabbed Plaintiff's arm when Plaintiff and Wolever were discussing Plaintiff's instructions on how to do maintenance. Def. SMF at ¶ 88. Plaintiff also claimed that, in 2012 or later, Hite yelled over the radio at new employees, although Plaintiff did not specify that he was the target of the rant. Def. SMF at ¶ 89.

Plaintiff also claims that, in 2010, McCarthy told Plaintiff to "leave the white boys alone," in reference to Caucasian employees allegedly complaining to McCarthy about Plaintiff's sending two African-American employees to central control to train. Def. SMF at ¶ 84; Pl. Dep. at 136-39. Plaintiff testified further that, in or around February of 2011, during a shift meeting in the conference room attended by number

of employees, including Plaintiff, McCarthy said, "the difference between a White worker and a Black worker, a [B]lack worker wants to work four hours and sit down for four hours … [A] white worker is a good worker. A White worker will work with you all day. He will help you in any way he can. He is a good worker." Def. SMF at ¶ 83; Pl. Dep. II at 53-55, Def. Ex. L. Plaintiff also claims that, in 2011, McCarthy told him, Bush, and Hopkins that he was going to "break up this clique," and McCarthy accused Plaintiff of protecting Hopkins, a Technician on his shift. Def. SMF at ¶ 93. Plaintiff asked McCarthy what he was protecting Hopkins from, but McCarthy did not say. Def. SMF at ¶ 94. Plaintiff also asked McCarthy, "what is a clique?", but McCarthy would not tell him. Def. SMF at ¶ 94.

Plaintiff also claims that he had heard McCarthy, who is African-American, accuse other African-American employees of stealing time. Def. SMF at ¶¶ 95-96; Pl. Dep. at 193, 203-04. In 2011, Plaintiff also heard a Caucasian employee named "Lowe" say, "y'all making too much money"; however, Plaintiff did not know who "y'all" was and did not ask Lowe. Def. SMF at ¶ 97. Plaintiff claims that Lowe made that statement to an audience comprised only of African Americans. Pl. Resp. SMF at ¶ 97. Plaintiff also argues that African-American employees were generally treated poorly, and were denied opportunities to train in central control, while white employees were taken out of training to work in the control room. *See* Pl. Br. at 6. He

58

also cites to evidence that the white employees "routinely smoked cigars with the site manager out on the loading dock while on company's time." Pl. Br. at 7.[8]

Defendant argues that it is "illogical to believe that Plaintiff was subjected to a racially hostile work environment" because McCarthy, the Site Manager, is African-American, and all of Plaintiff's supervisors throughout his employment at CMSI have been African-American. Def. Br. [29] at 8-9. The Court rejects the Defendant's argument that Plaintiff cannot establish a claim of a racially hostile work environment based solely on the fact that McCarthy, the alleged perpetrator of the hostile work environment, is himself African-American, and Plaintiff's other supervisors were African-American. The United States Supreme Court has addressed this issue:

> [I]n the [] context of racial discrimination in the workplace we have rejected any conclusive presumption that an employer will not discriminate against members of his own race. "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group."

---

[8] Plaintiff also argues in his brief that McCarthy told him: "Do not call Miami for anything or you will be put out on the street." Pl. Br. [35] at 7. Plaintiff failed to include this fact in his Response to Defendant's Statement of Facts, and as discussed above, the Court cannot consider any fact asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact . . . (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). Nevertheless, even if the Court considered this alleged statement by McCarthy, it would still find that Plaintiff was not subjected to a hostile work environment based on his race. Plaintiff does not even explain what this statement has to do with his race.

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998) (*quoting Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).

Nevertheless, the Court must conclude that, based on the record evidence cited by Plaintiff, he has failed to establish that the Defendant maintained a racially hostile work environment. Significantly, Plaintiff does not allege that McCarthy, or anyone else employed at CMSI, ever used a racial slur in his presence.[9] Furthermore, other than the one occasion in 2011 in which Plaintiff claims that McCarthy explained the difference between a white worker and black worker and allegedly disparaged black workers, Plaintiff does not allege that anyone else ever said anything to him that specifically referenced his race. Instead, he claims only that McCarthy told him to "leave the white boys alone" when he complained about his white co-workers, and that McCarthy accused African-American employees of "stealing" time on at least one occasion.

To be sure, McCarthy's comments, particularly those that expressly disparaged black workers in comparison to white workers, are sufficient to show racial animus by McCarthy. Thus, the Court considers these statements repeatedly in the pages that

---

[9] Plaintiff does allege that a co-worker overheard another employee use the "n-word" on one occasion, but Plaintiff does not claim that anyone ever said that word to him or in his presence. *See* Pl. Br. at 6; Pl. Resp. SMF at ¶ 4 n.2.

follow in assessing whether Plaintiff has shown evidence to support his claim that Defendants discriminated against him in concrete ways.

But simply because these few statements show animus–and may support discrete claims of discrimination–does not mean that they are sufficiently severe and/or pervasive to establish a ***hostile work environment***. Absent other evidence, these statements simply do not reach that level. Over the several years that McCarthy managed the site, Plaintiff identifies three or so statements revealing animus, none of which involved actual slurs or epithets, and none appears to have been specifically directed at Plaintiff. In and of themselves, these few statements fall short of what is required to show hostile work environment. *See Singleton v. Auburn University Montgomery*, 520 Fed. Appx. 844, 848 (11th Cir. 2013) (isolated references to plaintiff as "Do Boy," even while revealing some level of animus, were insufficient to support a charge for a hostile work environment); *Pizzini v. Secretary for Department of Homeland Security*, 495 Fed. Appx. 991, 995 (11th Cir. 2012) (comments by a supervisor that "Puerto Ricans will never be promoted in the Miami Field Office because they don't know how to speak or write English," while establishing racial animus, was not of enough severity or frequency required to sustain a claim for hostile work environment).

Plaintiff also alleges that various other employees, not McCarthy, spoke in "hostile" tones or raised voices. But he adduces no admissible evidence showing that these "hostile" tones included racially-based references or otherwise were targeted against him on the basis of race. And Plaintiff admits that at least one of these incidents "was nothing serious." Def. SMF at ¶ 87. This evidence fails to show either a hostile work environment **on the basis of race** or sufficiently severe or pervasive conduct.

Moreover, while Plaintiff arguably establishes at least one discrete act of discrimination, as explained below, his perception that McCarthy broadly and pervasively favored white workers in terms of discipline, work assignments, allowing early clock-in times, and other things, is mostly unsupported by any admissible evidence in the record. The evidence simply does not support his perception, for example, that Caucasian workers were favored in terms of receiving assignment of overtime, receiving favorable training assignments, discipline, or being allowed to "clock-in" early. In any event, these various allegations at most concern "patterns of discrimination practiced against black employees, which constitute discrete acts that must be challenged as separate statutory discrimination and retaliation claims," and are not properly "brought under a hostile work environment claim that centers on

discriminatory intimidation, ridicule, and insult." *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008).

Plaintiff has simply failed to cite to sufficient admissible evidence establishing that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). For that reason, the Court finds that the Plaintiff has failed to establish a *prima facie* case of a racially hostile work environment. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to Plaintiff's claim of race discrimination based on a hostile work environment.

### 2.  *Failure to Promote - 2011 Engineer Position*

Plaintiff claims that Defendant discriminated against him on the basis of his race when it failed to promote him to an Engineer position in 2011. As explained below, the Court finds that Plaintiff establishes a *prima facie* on this claim, albeit barely. Despite certain logical difficulties with the claim, a jury *could* find that Defendant's non-discriminatory reasons for failing to promote Plaintiff were pretextual and summary judgment is therefore inappropriate.

a.     *Prima Facie* Case

In order to establish a *prima facie* case of a discriminatory failure to promote, Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications, and (4) the individual who received the promotion is not a member of his protected class. *See Walker v. Mortham*, 158 F.3d 1177, 1193, *reh'g denied*, 167 F.3d 542 (11th Cir. 1998).

Defendant notes that there is a intracircuit "split" in the Eleventh Circuit regarding the proper formulation of a *prima facie* case of discriminatory failure to promote. *See* Def. Br. at 20 n.1. It notes that there is some authority holding that a plaintiff must also present evidence that "the selected employee was equally or less qualified than the plaintiff." *Id.* (citing *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n.7 (11th Cir. 1983)). The Court concludes that the proper formulation of a *prima facie* case was established in *Walker v. Mortham*, 158 F.3d 1177, 1192-93 (11th Cir. 1998), which held that a court "may *never* require a plaintiff to establish that she is more qualified than the successful promotee, let alone impose that requirement at the *prima facie* stage." *Walker*, 158 F.3d at 1192 (emphasis in original)).

The *Walker* decision expressly addressed the intracircuit split regarding the formulation of the *prima facie* case in claims based on a discriminatory failure to promote. Before *Walker*, many Eleventh Circuit opinions, relying upon a footnote in *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n.7 (11th Cir. 1983), required a plaintiff to show as part of a *prima facie* case of discrimination that the person who received the promotion had "lesser or equal qualifications" than the plaintiff. *See, e.g., Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988). Other opinions, relying upon *Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980), did not impose such a requirement at the *prima facie* stage. *See Walker*, 158 F.3d at 1186, 1193. The *Walker* court held that, under the "earliest case" rule, the *Crawford* decision controlled, and specifically held that a plaintiff need *not* prove relative qualifications to establish a *prima facie* case of discrimination based on a failure to promote. *Walker*, 158 F.3d at 1189, 1193 ("[W]e hold that the district court in this case erred in imposing as part of the *prima facie* case a requirement that each plaintiff establish that the successful applicant for his or her coveted position was less than or equally qualified to hold the position.").

Despite the exhaustive discussion of the issue in the *Walker* decision, later Eleventh Circuit panels inexplicably continued to apply the *Perryman* rule that was expressly rejected in *Walker*, without even citing *Walker* or addressing the intracircuit

65

split. *See, e.g., Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004);

*Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Lee v. GTE Florida,*

*Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000); *Taylor v. Runyon*, 175 F.3d 861, 866 (11th

Cir. 1999). Under the "earliest case" rule, however, the Court finds that the decision

in *Walker* is binding precedent and controls. Therefore, to establish a *prima facie* case

of race discrimination based on a failure to promote, Plaintiff must show that he was

qualified for and applied for the promotion, he was rejected in spite of his

qualifications, and a person of a different race received the promotion. *See Walker*,

158 at 1193.

   Defendant argues that Plaintiff is unable to establish a *prima facie* case because

he has failed to present any evidence that he was qualified for the Engineer positions

posted in 2011. The record evidence reflects that, on March 31, 2011, CMSI posted

a memorandum to all employees that the Company would be creating two new

Engineer positions, which would require "backup supervisory or managerial services,"

along with a "Bachelor's degree in Electrical or Mechanical engineering or equivalent

experience required." Def. SMF at ¶ 49. Plaintiff does not dispute that the position

required a degree or equivalent experience. Pl. Resp. SMF at ¶ 49. During the

interviews for the position, the first question posed to the candidates was: "This

position has 2 major responsibilities: technical support and supervision of employees.

66

Describe your experience in these 2 areas." Def. SMF at ¶ 55. The other questions focused on attributes related to the employee's technical backgrounds and leadership/supervisory attributes. Def. SMF at ¶ 56. Plaintiff does not dispute that supervisory experience was required for the position. Pl. Resp. SMF at ¶¶ 55-56. He contends, however, that he had previous supervisory experience and that, during his initial interview with CMSI, he informed Mihalco, Champ, and McCarthy that he had previous supervisory experience. Pl. Resp. SMF at ¶¶ 61, 235.

Plaintiff also argues that McCarthy had previously offered him an Engineer position in Miami, which he claims demonstrates that he met the minimum qualifications. Plaintiff contends that, in 2009, McCarthy told him while they were both in the coffee room that "Miami wanted [his] skills for an Engineer position in Miami." Def. SMF at ¶ 225. Plaintiff contends that McCarthy told him that Champ wanted him in Miami; Plaintiff interpreted that to mean the position was his if he wanted it, but he told McCarthy he could not move his family to Miami. Def. SMF at ¶ 226; Pl. Resp. SMF at ¶ 226. According to Plaintiff, McCarthy told him that Champ wanted Plaintiff for the Miami position and the position was his if he wanted it, but the only reason he did not take the position is because he did not want to move his family to Miami. Pl. Resp. SMF at ¶¶ 228-29.

67

For the purposes of the *prima facie* case under Title VII, "qualified" refers to minimal qualifications rather than relative qualifications or optimal performance. *See, e.g., Goyette v. DCA Advertising, Inc.*, 828 F. Supp. 227, 233 (S.D.N.Y. 1993); *McCullough v. Consolidated Rail Corp.*, 776 F. Supp. 1289, 1295 (N.D. Ill. 1991); *Long v. First Family Financial Services Inc.*, 677 F. Supp. 1226, 1231 (S.D. Ga. 1987) ("'[q]ualified,' under any plain meaning given to the word, relates to the background and skills necessary to carry out the functions of the position. Whether the employee was applying those skills in a satisfactory manner is a separate question"). The Eleventh Circuit has held that, in order to determine if a plaintiff was qualified for a particular position, a court must focus on the plaintiff's skills and background. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993); *see also Woody v. St. Clair Cty. Comm'n*, 885 F.2d 1557, 1561-63 (11th Cir. 1989); *Wu v. Thomas*, 847 F.2d 1480, 1484 (11th Cir. 1988).

At the *prima facie* stage, Plaintiff is not required to prove that he was qualified, but at the very least, he must present evidence that would be sufficient to establish a genuine issue of fact regarding whether he was minimally qualified for the Engineer position. The Court finds that Plaintiff has done so in this case. That McCarthy informed Plaintiff that he could have the Engineer position in Miami suggests that Defendant (or at least McCarthy, who was one of the interviewers and decision-

makers) viewed Plaintiff as qualified. Moreover, Plaintiff adduces evidence that he had prior supervisory experience of which McCarthy and others were aware. While it appears undisputed that Plaintiff lacked a bachelor's degree in engineering, the job posting called for either a degree *or* equivalent experience. There is at least a factual dispute as to whether Plaintiff possessed such equivalent experience.

Thus, the Plaintiff has established a *prima facie* case by showing that he was minimally qualified for the Engineer position, he was not selected for the position, and a person who was not African-American was selected for the position. It is undisputed that the two people selected for the Engineer positions were Bush, who is African-American, and Perret, who is white. Def. SMF at ¶ 57. The Defendant, therefore, must present evidence that it had a legitimate reason for choosing Perret over Plaintiff that was not related to the Plaintiff's race.

b.      Defendant's Legitimate Reason

The Defendant has presented evidence that it had legitimate reasons for selecting both Bush and Perret for the Engineer positions in 2011. Defendant has cited to evidence that Champ and Mihalco reviewed all the submissions, asked McCarthy, Yoshida, and Marshall for input, and decided on four individuals to interview: Bush and Bray, who are African-American, and Perret and Rhodes, who are white. Def. SMF at ¶ 52. Mihalco, Champ, and McCarthy interviewed all four candidates by

asking them the same questions, and then they discussed their answers and qualifications. Def. SMF at ¶ 54. There were a total of seven questions asked; the very first question was: "This position has 2 major responsibilities: technical support and supervision of employees. Describe your experience in these 2 areas." Def. SMF at ¶ 55. The other questions mainly focused on attributes related to the employee's technical backgrounds and leadership/supervisory attributes. Def. SMF at ¶ 56.

It is undisputed that Champ, Mihalco, and McCarthy made the decision to promote Bush and Perret for the positions. Def. SMF at ¶ 57. Bush, an African-American, was chosen because he has a college degree and 23 years of experience working for MARTA, a similar transit system to CMSI, and while at MARTA he had several years of supervisory experience. Def. SMF at ¶ 59. Perret was selected because he has a Bachelor's degree in electrical engineering, nine years of experience in the engineering field, and was an assistant project manager for a year leading many other employees prior to coming to CMSI. Def. SMF at ¶ 58. Defendant contends that Plaintiff was not given an interview because he did not have supervisory experience like the other candidates chosen for an interview, and CMSI was not aware of any previous supervisory experience that Plaintiff had while working with MARTA. Def. SMF at ¶¶ 60, 235.

The Court finds that Defendant has met its burden of presenting sufficient evidence that it had a legitimate non-discriminatory reason for promoting Perret instead of Plaintiff to the Engineer position. Thus, in order for Plaintiff to defeat the Defendant's Motion for Summary Judgment he must cite to some evidence in the record that would be sufficient to establish that Defendant's proffered reason is a pretext for race discrimination.

c.     Pretext

As discussed above, a plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. In employment discrimination cases involving a failure to promote claim, when an employer's proffered reason for promoting another applicant over the plaintiff is that the person promoted was more qualified, and the plaintiff attempts to present evidence of pretext by establishing that he was more qualified than the person promoted, the Eleventh Circuit has held that:

> [A] plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race. We have explained, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the

71

wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer.

*Brooks v. County Comm. of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations omitted); *see also Chapman v. A.I. Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (an plaintiff cannot successfully establish pretext "by simply quarreling with the wisdom of that reason").

Thus, when an employer has presented evidence that the person promoted had superior qualifications to the plaintiff, and the plaintiff attempts to establish pretext by challenging that reason and establishing that the plaintiff had superior qualifications, the plaintiff may not merely present his own opinion that his qualifications were superior; instead, "[a] plaintiff must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Brooks*, 446 F.3d at 1163 (*quoting Cooper v. Southern Co.*, 390 F. 3d 695, 732 (11th Cir. 2004)); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (*per curiam* ) (approving this language from *Cooper* as one method of establishing pretext).

Although a plaintiff may establish pretext by presenting evidence of his superior qualifications over the person promoted, prior Supreme Court and Eleventh

Circuit decisions have made it clear that a plaintiff is never required to demonstrate his superior qualifications in order to establish pretext; presenting evidence of superior qualifications is just one way among several that a plaintiff may establish pretext in a failure to promote case. *Walker v. Mortham*, 158 F.3d 1177, 1192-93 (11th Cir. 1998) (a court "may *never* require a plaintiff to establish that she is more qualified than the successful promotee, let alone impose that requirement at the *prima facie* stage" (emphasis in original)) (*citing Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)).[10] As the Supreme Court has explained, a plaintiff may present evidence of pretext in a variety of ways and a court may not require any specific type of evidence to establish pretext:

> Although petitioner retains the ultimate burden of persuasion, our cases make clear that she must also have the opportunity to demonstrate that respondent's proffered reasons for its decision were not its true reasons. In doing so, petitioner is not limited to presenting evidence of a certain type. This is where the District Court erred. The evidence which petitioner can present in an attempt to establish that respondent's stated reasons are pretextual may take a variety of forms. Indeed, she might seek to demonstrate that respondent's claim to have promoted a better

___

[10] Although *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) was superseded on other grounds by 42 U.S.C. § 1981(b), its ruling on a plaintiff's burden of establishing pretext has not been overruled and remains binding precedent. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (*per curiam*) (citing *Patterson* for the proposition that a plaintiff "might" seek to demonstrate pretext by establishing that he or she was better qualified than the person promoted).

qualified applicant was pretextual by showing that she was in fact better qualified than the person chosen for the position. The District Court erred, however, in instructing the jury that in order to succeed petitioner was required to make such a showing. There are certainly other ways in which petitioner could seek to prove that respondent's reasons were pretextual. Thus, for example, petitioner could seek to persuade the jury that respondent had not offered the true reason for its promotion decision by presenting evidence of respondent's past treatment of petitioner . . . . She may not be forced to pursue any particular means of demonstrating that respondent's stated reasons are pretextual. *It was, therefore, error for the District Court to instruct the jury that petitioner could carry her burden of persuasion only by showing that she was in fact better qualified than the white applicant who got the job.*

*Patterson*, 491 U.S. at 186-88 (emphasis added, internal citations omitted); *see also Walker*, 158 F.3d at 1191-92.

A plaintiff may present evidence of pretext in a variety of ways that cast doubt on the employer's proffered reason. Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, however, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

74

In this case, Plaintiff points out that McCarthy previously offered him an Engineer position in Miami, and also relies on "the ongoing racial remarks, slurs, assignments, overtime, disparate discipline." Pl. Br. at 23. That McCarthy supposedly offered him the same position in Miami if anything contradicts the claim that McCarthy was biased against Plaintiff on grounds of race. And as previously explained, Plaintiff generally fails to show a pervasive and ongoing atmosphere of racial remarks, slurs, or other conduct reflecting an animus against Plaintiff because of his race.

Nevertheless, it remains significant that McCarthy in early 2011 expressed a view that white workers are better workers and are more reliable than black workers. While Plaintiff fails to show an "ongoing" and pervasive series of slurs, this remark, and the handful of other similar remarks by McCarthy, could support a finding that McCarthy discriminated in favor of a white applicant for the Engineer position. While McCarthy was only one of several supervisors involved in the hiring process, he was involved in the interviews and he was one of the three individuals who made the decision to choose Perret for the position. Def. SMF at ¶¶ 52, 57.

Plaintiff also argues that, contrary to the Defendant's allegations, he did have supervisory experience. He claims that, during his initial interview with CMSI, he informed Mihalco, Champ, and McCarthy that he had previous supervisory experience

when he owned his company and worked with MARTA. Pl. Resp. SMF at ¶ 235. Plaintiff admits that his supervisory experience is not indicated on his resume, although he states that Defendant was otherwise aware of his background. Presumably, Plaintiff also offers the fact that McCarthy suggested he apply or even that he would be accepted for the Miami Engineer position–which otherwise would seem to contradict a claim of McCarthy's racial biases–as further evidence that at least McCarthy knew that Plaintiff had the necessary supervisory experience. Thus, the Court finds that this fact is in genuine dispute. Plaintiff certainly does not adduce evidence that he was more qualified than Perret. But he at least points to evidence that he possessed prior supervisory experience, and that Defendant knew this fact, which contradicts the stated reason why Defendant denied Plaintiff an interview, that is, that Plaintiff supposedly lacked supervisory experience.

Undoubtedly, Plaintiff faces major challenges with this claim. That Defendant promoted Bush, an African-American, at the same time it promoted Perret, and then promoted Nelson, another African-American, when Bush left the Company in 2012, would seem to belie the claim of racial discrimination. That the individuals who were hired had greater educational degrees and more supervisory experience (at least as was reflected in their resumes) than Plaintiff would also be an obstacle. But the Court is compelled to assume that one of the decision-makers involved in the promotion

decision, McCarthy, expressed and held the view that white workers are superior to black workers. And the Court is compelled to assume that Plaintiff was denied an interview on a basis–Plaintiff's lack of supervisory experience–that at least McCarthy knew to be untrue because Plaintiff told him about his prior supervisory experience. This combines to create an issue of fact as to whether McCarthy's supposed bias, if he had one, influenced the decision to promote Perret instead of Plaintiff. The weaknesses and internal contradictions in Plaintiff's theory would be a matter for the jury to consider. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **DENIED** as to Plaintiff's claim that he was denied the 2011 promotion because of his race.

### 3.   *Failure to Promote - 2012 Engineer Position*

It is not entirely clear whether Plaintiff is asserting a claim against Defendant for race discrimination based on his denial of a promotion to the Engineer position in 2012, after Bush left his employment with the Company. *See* Compl. at ¶ 23 (Plaintiff alleges that Defendant discriminated against him "relative to plaintiff's non-selections to the engineering position"). It is undisputed that Nelson, the employee who was promoted that position, is African-American. Def. SMF at ¶ 78. Defendant contends that Nelson was chosen for the position instead of Plaintiff because he has an associate's degree in electronics, 28 years of electrical mechanic experience, and

supervisory experience from his previous job. *Id.* Because it is undisputed that an African-American was selected for the position, the Court finds that, to the extent that Plaintiff intended to assert a claim of race discrimination based on his failure to be promoted to the Engineer position in 2012, Plaintiff is unable to establish a *prima facie* case. Accordingly, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to Plaintiff's claim that he was denied the 2012 promotion because of his race, to the extent that Plaintiff intended to assert such a claim.

### 4.    *Denial of Overtime*

Among the many other claims that Plaintiff throws at the wall in this case is that Defendant discriminated against him on the basis of his race when it denied him opportunities to work overtime in 2011.

### a.    *Prima Facie* Case

Plaintiff does not contend that he has produced any direct evidence of any discriminatory intent. Thus, his claim of race discrimination based on the alleged denial of overtime pay rests purely on circumstantial evidence and must be analyzed under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful race discrimination by showing

78

that: 1) he is a member of a protected class;[11] 2) he was subjected to an adverse employment action by his employer; 3) he was qualified to do the job in question, and 4) his employer treated similarly situated employees of a different race more favorably than it treated him. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

It is undisputed that Plaintiff was the Technician with the highest number of overtime hours in 2009 and the employee with the second highest number of overtime hours in 2010. Def. SMF at ¶ 147; McCarthy Decl. [29-13] at ¶¶ 16-18, Ex. 3. It is further undisputed that the Company reduced overtime for all employees in 2011, compared to previous years. Plaintiff admits that overall, the overtime hours worked by the Atlanta site employees dropped from 10,682.87 hours worked in 2010 to 4,812 hours worked in 2011. Def. SMF at ¶ 149; Pl. Resp. SMF at ¶ 149. Plaintiff nevertheless contends that he was subjected to an adverse employment action when

---

[11] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he is a member of a "protected class," it is clear that individuals of any race may pursue claims of employment discrimination. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (*citing McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). Thus, because every individual is a member of a "protected class," the key element of a *prima facie* case is establishing that persons of a different race were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3.

the Defendant "denied" him overtime opportunities in 2011. He contends that the Company allowed three white employees, Chris Hite, Tim Fox, and Matt Lowe, more overtime opportunities in 2011 than it allowed him. *See* Pl. Br. at 13-14.

The Court finds that Plaintiff has failed to show that Matt Lowe could be considered a relevant comparator. It is undisputed that Lowe was actually a DBE employee, and not an employee of CMSI. Def. SMF at ¶¶ 6-7. Plaintiff has not cited to any evidence in the record that Lowe could be considered similarly situated to the Plaintiff, nor has he cited to any evidence that McCarthy or anyone else employed by CMSI controlled the overtime worked by Lowe. Furthermore, Plaintiff has not cited to evidence demonstrating that Lowe actually worked more overtime hours than he did in 2011. For these reasons, the Court finds that Lowe was not a relevant comparator for the purpose of Plaintiff's race discrimination claim based on the denial of overtime in 2011.

It appears to be undisputed, however, that both Hite and Fox worked more overtime hours than did the Plaintiff in 2011. *See* McCarthy Decl., Ex. 3. According to the Company records, Hite worked more overtime than any other Technician or Lead Technician at the Atlanta Site in 2011. *Id.* Defendant contends, however, that the overtime hours were not distributed on the basis of race, and were instead distributed under a new system. Although the parties dispute how the specific system was

implemented, they agree that the Atlanta site switched to a new "matrix system" for distributing overtime in mid-2011. Def. SMF at ¶ 144; Pl. Resp. SMF at ¶ 144. According to Defendant, when there was an overtime opportunity, the Engineer on the shift would look at the matrix list and ask the employee who is at the top of the list if he was available to work, and the Engineer would move down the list until he found an available employee. Def. SMF at ¶ 145. The next time an opportunity arose, the Engineer on the shift would start on the list where the Engineer from the last time stopped; if the bottom of the list was reached, the Engineer would start again at the top. Def. SMF at ¶ 145.

Plaintiff disputes that the matrix system worked in the manner that Defendant claims it did, although he does not present any specifics as to how the system actually worked. Plaintiff also admits that Frazier, Dobbs, Phillips, and Ghant, all African Americans, were the employees with, respectively, the second, third, fourth and fifth highest number of overtime hours in 2011. Def. SMF at ¶ 148; Pl. Resp. SMF at ¶ 148. Thus, according to the Company's records, five out of the six employees with the highest number of overtime hours worked in 2011 are African-American. McCarthy Decl., Ex. 3.

Nevertheless, because it also appears to be undisputed that both Hite and Fox worked more overtime hours than the Plaintiff in 2011, the Court finds that the

Plaintiff has presented a *prima facie* case of race discrimination with respect to the distribution of overtime hours. The Company's records indicate that Plaintiff's overtime hours were reduced to 112 hours in 2011, while Hite worked 606 hours and Fox worked 396 hours. McCarthy Decl., Ex. 3. Thus, the Plaintiff has shown that, with respect to overtime hours, the Company paid both Hite and Fox more overtime than it paid to Plaintiff in 2011. Accordingly, the Plaintiff has shown that the Company treated two white employees[12] more favorably than it treated him with respect to overtime pay in 2011.

### b.   Defendant's Legitimate Reason

Defendant has presented evidence that it had a legitimate reason for giving other employees more overtime hours than the Plaintiff in 2011. According to Defendant, many overtime hours are worked during the third shift because only half of the system is being operated at that time, which allows for maintenance to be performed without interfering with the operation and availability of the system. Def. SMF at ¶ 150. Defendant contends that the overtime that is worked during the third shift is worked by employees on the second shift (who stay late to work overtime if

---

[12] As noted in the facts, the parties dispute whether Fox was white or Asian-American; according to Plaintiff, Fox has a Japanese mother and a white father. *See* Pl. Resp. SMF at ¶ 5. The Court finds that, whether Fox identifies himself as white or Asian-American is not material because it is undisputed that he is not African-American, and thus, is a different race from Plaintiff.

needed) and first shift (who come in early to work overtime if needed), and not by employees like Plaintiff on the third shift because it is their regular shift (not overtime). Def. SMF at ¶ 151. For employees like Plaintiff, who are scheduled to work third shift, overtime opportunities available to them on the third shift typically only occur on their days off from work. Def. SMF at ¶ 152.

It is undisputed that Hite worked on the second shift in 2011. Def. SMF at ¶ 153. According to Defendant, Hite worked the most overtime in 2011 because the Atlanta site was experiencing problems with the daily recording and reporting system ("DRR") and the power distribution system ("PDS"), and Hite was one of the few individuals who had been trained by the MHIA Engineers to manually calculate the formulas the DRR completes, and Hite was considered an expert on the PDS. Def. SMF at ¶ 154; McCarthy Decl. at ¶ 24. While the Defendant does not state whether Fox worked on the first, second, or third shift,[13] it has presented evidence that the overtime hours were distributed under the matrix system, and that race was not a factor. It further argues that Plaintiff turned down overtime opportunities on occasion. Plaintiff admits he turned down overtime on a few occasions when he had a prior appointment, when he was asked at the last minute, or if he had a family emergency. Def. SMF at ¶ 155; Pl. Resp. SMF at ¶ 155; Pl. Dep. at 117-118 (Plaintiff testified that

---

[13] Plaintiff contends that Fox worked on the second shift. Pl. Br. at 16-17.

he turned down overtime "probably three times" in 2011, and probably "once or twice" in the years of 2012 and 2013). Plaintiff also admits he never talked to McCarthy about wanting to work more overtime at any point during his employment. Def. SMF at ¶ 156.

The Court finds that Defendant has met its burden of presenting evidence that it had legitimate non-discriminatory reasons for giving Hite and Fox more overtime hours than the Plaintiff in 2011. Thus, in order for Plaintiff to defeat the Defendant's Motion for Summary Judgment, he must cite to some evidence in the record that would be sufficient to establish that Defendant's proffered reasons are a pretext for race discrimination.

c.     Pretext

A plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come

forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

Because a plaintiff bears the burden of establishing that a defendant's reasons are a pretext for discrimination, a plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830.

Plaintiff argues that he has presented evidence of pretext by pointing to the same evidence he cited for his *prima facie* case: he contends that the evidence in the record demonstrating that Hite, Fox, and Lowe worked more overtime hours than he did in 2011 is also his evidence of pretext. *See* Pl. Br. at 15 ("plaintiff can, and does, rely upon his three comparators, to meet his burden to point to the existence of evidence which could cause a reasonable jury to find for him"). The Court finds that

85

Plaintiff has failed to present sufficient evidence that the Defendant's proffered reasons are a mere pretext for race discrimination.

First, as discussed above, the Plaintiff has failed to cite to any evidence in the record establishing that Lowe could be considered a similarly situated comparator, because it is undisputed that Lowe was actually a DBE employee, and not an employee of CMSI. In addition, Plaintiff has not cited to any admissible evidence in the record that Lowe actually worked more overtime hours than he did in 2011.

Second, Plaintiff has also failed to present evidence that Defendant's proffered reasons for giving Hite and Fox more overtime hours than Plaintiff in 2011 are a pretext for race discrimination. Plaintiff does not cite to any evidence that disputes the Defendant's proffered reasons. He does not dispute that the Company significantly reduced overtime hours for all employees across the board. He does not dispute that the Company began distributing overtime under the matrix system in mid-2011 (although he does dispute that it was actually implemented in the manner in which Defendant claims). He also does not dispute that, out of the six employees with the highest overtime hours in 2011, five of them were African-American. Plaintiff also does not dispute that he turned down overtime opportunities on occasion, and he admits that he never talked to McCarthy about wanting to work more overtime.

Plaintiff also does not dispute that Hite, the white employee who worked the most overtime hours, had been trained by the MHIA Engineers to manually calculate the formulas the DRR completes, nor does he dispute that Hite was considered an expert on the PDS. Plaintiff claims that he also worked on the PDS, and that McCarthy never told him that Hite was an expert on the PDS. Pl. Resp. SMF at ¶ 154. But this contention does nothing to suggest that the Defendant's reasons for giving Hite the most overtime hours in 2011 were not true or were a pretext for race discrimination.

The only reason proffered by Defendant that Plaintiff attempts to dispute is the Defendant's contention that employees who worked on the third shift were given fewer overtime opportunities than employees on other shifts. Relying only on his own Declaration, Plaintiff contends that "[a]ll QMP's on the Third shift are required to work the same number of hours as other QMP's on other shifts." Pl. Resp. SMF at ¶ 150. Plaintiff further contends that "Plaintiff as well as any other Third shift QMP would have opportunities to work overtime if there was an emergency–the same as any other QMP on any other shift." Pl. Resp. SMF at ¶ 152.

While it is undisputed that Plaintiff and the other employees who worked the third shift were given overtime opportunities (it appears to be undisputed by Plaintiff that he worked 112 hours of overtime in 2011), he does not cite to any record evidence

disputing the Defendant's contention that many overtime hours were worked during the third shift, when only half the system was in operation, and when maintenance could be performed without interfering with the operation and availability of the system. Furthermore, he does not dispute the Defendant's contention that Hite and Frazier, the two employees who worked the most overtime hours in 2011, worked on the second shift.

Plaintiff's only cited evidence that might be considered evidence of pretext is his evidence that McCarthy, the African-American site manager, expressly stated an animus against African-American workers: "[t]he difference between a White worker and a Black worker, a [B]lack worker wants to work four hours and sit down for four hours … [A] white worker is a good worker. A White worker will work with you all day. He will help you in any way he can. He is a good worker." Def. SMF at ¶ 83. But Plaintiff has not linked this alleged comment to any decision made by McCarthy regarding the amount of overtime hours worked by Plaintiff compared to white employees. Plaintiff has not cited to any evidence indicating that McCarthy was the person who made the decision regarding who worked overtime on any given shift.

Instead, Defendant has presented evidence that it was the Engineer on each shift who would look at the matrix list and ask the employee who is at the top of the list if he was available to work, and the Engineer would move down the list until he found

an available employee. Def. SMF at ¶ 145. Plaintiff has not disputed the Defendant's contention that it was the Engineers who made the decision regarding who would work overtime, nor has he cited to any evidence that McCarthy influenced this decision by requiring the Engineers, including the African-American Engineers, to favor Caucasian employees over African-American employees in the distribution of overtime. Instead, the undisputed evidence indicates that five out of the top six overtime earners in 2011 were African-American employees.

In sum, the Court finds that the Plaintiff has failed to present sufficient evidence that the Defendant's proffered reasons for giving more overtime hours to Hite and Fox than to Plaintiff in 2011 were a mere pretext to disguise unlawful race discrimination. For that reason, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to this claim.

### 5. *Failure to Train in Central Control*

Plaintiff also claims that Defendant discriminated against him on the basis of his race by failing to train him to work in central control. Plaintiff claims that all the Caucasian employees worked in central control and did not have to do heavy maintenance. Def. SMF at ¶ 160; Pl. Resp. SMF at ¶ 160. Plaintiff contends that a disproportionate number of white employees worked in central control while a

89

disproportionate number of African Americans were in maintenance. Pl. Resp. SMF at ¶ 163.

The record evidence demonstrates that both Caucasian and African-American employees were central control operators from 2009 through the present. Def. SMF at ¶¶ 161-62; McCarthy Decl. at ¶ 25, Ex. 4. Defendant contends that both Caucasian and African-American employees who were not working in central control were working recovery and maintenance, which require employees to work in the shop, ride the trains, or be at the stations. Def. SMF at ¶ 163. The parties dispute much of the evidence concerning who was trained to work in central control, and who was not. Plaintiff claims that three Caucasian employees were pulled out of the June-August 2009 classroom training to train in central control, while Defendant contends that Odis Turk, an African-American, also left training early to get more specialized training to be a central control operator.

Plaintiff claims that he asked McCarthy to work in central control sometime in 2010 and McCarthy responded that CMSI was going to train everybody. Def. SMF at ¶ 185. Plaintiff admits, however, that when McCarthy did not follow up with Plaintiff's request, he never asked McCarthy again about training in central control. Def. SMF at ¶ 186; Pl. Resp. SMF at ¶ 186. Plaintiff further admits that, in 2010, Kashad Johnson, an African-American, was chosen to be the central control operator.

90

Def. SMF at ¶ 178; Pl. Resp. SMF at ¶ 178. Plaintiff also admits that other African-American employees worked in central control: Nelson worked in central control in 2010; Ghant worked in central control prior to January of 2012, Turk worked in central control throughout 2012, and Austin worked in central control, although Plaintiff could not remember the time period. *See* Pl. Resp. SMF at ¶¶ 179-83.

Although Plaintiff claims that McCarthy failed to train him in central control in 2010, he admits that in July of 2011, he was given the opportunity to cross-train in central control. Def. SMF at ¶¶ 157, 175. Plaintiff contends that he was given the opportunity to cross-train in central control only after he filed an EEOC charge. Pl. Resp. SMF at ¶¶ 157, 175. Nevertheless, it is undisputed that, Plaintiff received additional training in central control in 2011 and he was certified and started working in central control in 2013. Def. SMF at ¶ 177; Pl. Resp. SMF at ¶ 177.

It is undisputed that, as a result of CMSI's investigation of Plaintiff's claims, all Technicians were trained in central control and are now rotated in that position. Def. SMF at ¶ 184. Plaintiff received further training in central control following CMSI's investigation of his EEOC charge. Def. SMF at ¶ 187. Defendant contends that, prior to that time, CMSI did not have a business need to have Plaintiff work in central control, since there were already enough central control operators and Plaintiff was doing a good job with his duties. Def. SMF at ¶ 188.

Defendant argues that Plaintiff cannot establish a *prima facie* case of race discrimination based on his failure to be trained in central control prior to 2011, because he has failed to point to evidence that a similarly situated white employee received more favorable treatment by the Company. The Court agrees with Defendant, and further finds that Plaintiff has failed to establish a *prima facie* case because he has failed to present sufficient evidence that the Company's failure to train him in central control prior to 2011 was an adverse employment action.

Under the law of the Eleventh Circuit, for an employment action to be considered an "adverse action" that triggers liability, the decision must work a *material* alteration on the terms of employment. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way").[14] In general, courts have recognized that managers require broad discretion to distribute duties as they see fit, and absent extreme circumstances should not be forced

---

[14] As discussed above, the elements of a claim of race discrimination brought under § 1981 generally mirror the elements required under Title VII. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework").

to justify each assignment of job duties or responsibilities in front of a jury. *See, e.g., Shannon v. BellSouth Telecomm.*, 292 F.3d 712, 714-15 (11th Cir. 2002) (reassignment to position in which it was more difficult to meet performance criteria was not adverse employment action); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 588 (11th Cir. 2000) (allegation that professor was denied desired teaching assignments was not adverse employment action, absent evidence that she was somehow entitled to those courses or that other professors were allowed to pick their assigned classes). Thus, the law in the Eleventh Circuit is that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a *significant* change in benefits." *Davis*, 245 F.3d at 1239 (emphasis in original).

In this case, Plaintiff has failed to cite to any evidence in the record that the Company's failure to train him to work in central control in 2010, after he requested training from McCarthy, was an adverse employment action that had a *significant* adverse effect on his compensation, or another significant adverse effect on the terms and conditions of his employment. In general, a change in job duties or a lateral transfer to another position cannot be regarded as an adverse employment action merely because the employee subjectively finds one position preferable to the other,

absent some evidence that the plaintiff suffered a material loss of pay, prestige or other quantifiable benefit. *See, e.g., Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than minor change in working conditions will not do either." (internal citations omitted)).

In *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441 (11th Cir. 1998) the Eleventh Circuit held that a teacher who was transferred to a job outside his desired specialty at a different school could not establish an adverse employment action merely by showing that he subjectively preferred his former job. *Doe*, 145 F.3d at 1448-49; *see also Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir. 2001) (temporary transfer of state employee to different department for two months was not "adverse action" under Title VII even though employee did not like her new job, when there was no evidence "that the transfer decreased her responsibilities or benefits in any way"); *accord Burger v. Central Apt. Mgt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999); *Lederberger v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). As the D.C. Circuit has stated, the consensus appears to be that:

> [A] plaintiff who is made to undertake or who is denied a lateral transfer–that is, one in which she suffers no diminution in pay or benefits–does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncracies of personal preference are not sufficient to state an injury.

*Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999).

In this case, Plaintiff contends that he requested to McCarthy that he be given training in central control in 2010, but he did not actually receive the training until 2011. But he has failed to cite to any record evidence demonstrate that the Company's failure to train him in central control prior to 2011 resulted in a material adverse change in his pay or his working conditions. Furthermore, even assuming that Plaintiff could establish that the Company's failure to train him to work in central control in 2010 was an adverse employment action, he has failed to cite to record evidence that a similarly situated white employee received training in central control while the Plaintiff did not. As discussed, it is undisputed that Plaintiff received training in central control in 2011, and he admits that other African-Americans also worked in central control also. Although Plaintiff argues in his brief that Hite and Fox received more favorable treatment than he did because they received training in central control in 2009, he admits that Kashad Johnson was a central control operator on the third

95

shift, and that Odis Turk was a central control operator on the second shift. *See* Pl. Br. at 16.

In sum, the Court finds that Plaintiff has failed to establish a *prima facie* case of race discrimination based on the alleged denial of the opportunity to train in central control prior to 2011. Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion for Summary Judgment [29] be **GRANTED** as to that claim.

> 6. *Denial of Early Clock-In*

Plaintiff also claims that Defendant discriminated against him on the basis of his race when it failed to pay him when he clocked in early. He argues that "**after the employees were informed that they would not be paid for this conduct and that they should discontinue such** that Plaintiff and other African Americans, who did not heed the policy were not paid for the early clock in's but the white employees who continued to clock in early were paid for such." Pl. Br. at 21 (emphasis in original). Plaintiff contends that at some point around August through September 2011, January of 2012, and May through July 2012, he was not permitted to clock in to work up to 15 minutes early and be paid for those minutes because of his race. Def. SMF at ¶ 204. Plaintiff testified that this happened "quite a few times." Def. SMF at ¶ 204.

The evidence indicates that, during the time period raised by Plaintiff, August of 2010 through all of 2011 and May 2012 through July 2012, as a general rule, if an

employee clocked in between seven and fifteen minutes early for his or her shift, the employee would be paid an extra $0.25 an hour. Def. SMF at ¶ 215. Sometime around October 1, 2011, CMSI posted a notice above the time clock instructing employees to not punch in more than 15 minutes earlier than their start time. Def. SMF at ¶ 217. On November 14, 2011, CMSI posted a memorandum to the employees stating that employees are not allowed to clock in more than 15 minutes early at the start of their shift and that, even if employees clock in up to 15 minutes before their shift, they should not start working until their scheduled start time and must stop working at their scheduled end time and will only be paid for the actual hours they worked. Def. SMF at ¶ 218. The memorandum also states that it was being implemented because the results of a recent audit demonstrated that early clocking-in was causing "a significant impact on the budget" of the site. Def. SMF at ¶ 218.

Plaintiff testified that he understood the memorandum to mean that if he were scheduled to start at 10:00 p.m. and he clocked in at 9:46 p.m., he would not be paid from 9:46 to 9:59 p.m. Def. SMF at ¶ 220. Plaintiff further admitted that, prior to the memorandum being posted, McCarthy personally told Plaintiff and other employees during a shift meeting in early 2011 that they would not be paid for their early clock-in times. Def. SMF at ¶ 221. CMSI sent another memorandum to its employees on May 29, 2013, reminding them that they may clock in up to 15 minutes before their

97

shift start time, but they will only be paid for their scheduled hours due to budgetary constraints, unless they receive approval for those early or late minutes. Def. SMF at ¶ 223.

Plaintiff claims that both Fox and Hite were able to clock in up to 15 minutes early and were paid for it. Def. SMF at ¶¶ 209, 211. Plaintiff claims to know this because he saw the time sheets of Fox and Hite, although he cannot remember the date or month he saw them. Def. SMF at ¶¶ 210, 212. It is undisputed that, from August of 2010 through all of 2011 and from May of 2012 through July of 2012, Plaintiff clocked in up to 15 minutes early and was paid for it on 62 days. Def. SMF at ¶ 213. It is further undisputed that Fox and Hite both clocked in up to 15 minutes early and were paid for it on 45 and 41 days, respectively. Def. SMF at ¶ 213. In addition, on some occasions during this time period, CMSI changed the clock-in times for Plaintiff (160), Fox (154), and Hite (213) from their clock-in time to the exact time their shift started in order to reflect when they were to begin working, in accordance with Company policy. Def. SMF at ¶ 214.

Defendant argues that, because the undisputed evidence reflects that Plaintiff was treated more favorably than either Fox or Hite, Plaintiff has failed to establish a *prima facie* case of race discrimination based on the Company's alleged failure to pay him for clocking in early. The undersigned agrees. Plaintiff does not dispute the

Defendant's evidence indicating that, from August of 2010 through all of 2011 and from May of 2012 through July of 2012, Plaintiff was paid for clocking in early on 62 days, while Fox was paid for clocking in early on 45 days, and Hite was paid for clocking in early on 41 days. Plaintiff argues that he believes that Fox and Hite received more favorable treatment, but he has not cited to any evidence in the record supporting that claim.

Plaintiff's only argument in support of this claim is that "defendant's bald statistics are unavailing and show nothing." Pl. Br. at 21. But Plaintiff ignores the fact that it is his burden to present sufficient evidence to establish a *prima facie* case of race discrimination–he cannot merely argue that other white employees were treated more favorably, he must cite to competent evidence in the record to support that claim. The Court finds that he has not done so with respect to his claim that Defendant discriminated against him on the basis of his race by failing to pay him for clocking in early. For that reason, the undersigned **RECOMMENDS** that the Defendant's Motion for Summary Judgment [29] be **GRANTED** as to that claim.

7. *Other Claims*

Although it is not entirely clear from the Plaintiff's brief, the Plaintiff may also be arguing that the Defendant discriminated against him on the basis of his race in other ways. He alleges that white employees were treated more favorably because they

99

did not receive similar disciplinary actions for performance violations and attendance violations that the African-American employees received for similar conduct. He also alleges that white employees were allowed to smoke cigars with McCarthy. The undersigned finds, that to the extent that Plaintiff intended to base his claim of race discrimination on any of these allegations, he has failed to cite to sufficient evidence in the record to establish a *prima facie* case.

Plaintiff contends that African-American employees at CMSI were written up for performance violations when Caucasian employees would not be written up for the same violations. Def. SMF at ¶ 100; Pl. Dep. at 205. According to Plaintiff, Austin and Bray were written up for job performance while doing recoveries, while Fox and Hite both destroyed equipment and were not written up. Def. SMF at ¶ 101; Pl. Dep. at 205. Plaintiff further claims that Hite caused damage to the system and was never written up, and Fox shut down the system on a number of occasions while doing recovery. Def. SMF at ¶ 102; Pl. Dep. at 205. Plaintiff claims that Bray was written up for unauthorized use of the computer, but Josephus would also do the same thing and was not written up for it. Def. SMF at ¶ 103; Pl. Dep. at 209.

Defendant contends that, according to Company records, Caucasian and African-American employees have been equally disciplined for all violations of Company policies. Def. SMF at ¶¶ 108, 115; Mihalco Decl. at ¶¶ 55-56, Ex. 11.

Defendant further contends that it is unaware of any misconduct by Fox and Hite regarding destroying equipment, causing damage to the system, or shutting the system down. Def. SMF at ¶ 106. No write-ups for such misconduct are found in either of their personnel files maintained by the Company. Def. SMF at ¶ 106. Plaintiff claims that he told Mihalco about Hite's "blowing up the transformer" and claims that Mihalco replied that he had heard it. Pl. Resp. SMF at ¶ 106. Defendant contends that it is also unaware of Josephus's unauthorized use of the Company computer for personal use while on the clock. Def. SMF at ¶ 107. According to Defendant, no write-ups for such misconduct are found in his personnel file maintained by the Company. Def. SMF at ¶ 107. Plaintiff contends that McCarthy was "standing right next to Josephus when he was surfing the web for porn – regularly." Pl. Resp. SMF at ¶ 107.

With respect to these allegations regarding disciplinary actions, the Court finds that Plaintiff has failed to establish a *prima facie* case of race discrimination because he has failed to present any evidence that the Company treated any white employee more favorably than it treated *him*. Instead, his evidence concerns the way in which other African-American employees were treated with respect to disciplinary actions. But Plaintiff cannot base his own claim of race discrimination on the allegation that

other African-American employees–in this case, Austin and Bray–received disciplinary actions for conduct for which white employees were not disciplined.

Plaintiff also alleges that African-American employees were written up for attendance violations when Caucasian employees would not be written up for the same violations. Def. SMF at ¶ 109; Pl. Dep. at 194, 205. Plaintiff contends that both Hite and Josephus had attendance issues, but the Company failed to issue them disciplinary actions for their attendance problems. It is undisputed that Josephus has been written up for attendance issues on six different occasions since working at CMSI, although, with the rolling system, Josephus has never had 10 points at one time, requiring dismissal. Def. SMF at ¶ 111. Plaintiff contends that he has personally observed Josephus being late five times in 2013 and clocking in late over ten times in 2013. Pl. Resp. SMF at ¶ 111. But it is undisputed that Josephus has not been eligible for a raise for the past two years because he acquired eight or more points at one time in those years. Def. SMF at ¶ 109; Pl. Resp. SMF at ¶ 109; Pl. Dep. at 210.

Defendant contends that Hite has also been written up for attendance issues on five different occasions since working at CMSI, although, with the rolling system, Hite has never had 10 points at one time, requiring dismissal. Def. SMF at ¶ 114. Plaintiff contends that he personally observed Hite coming in late an average of 2-3 times per month in 2009, 2013, and 2014. Pl. Resp. SMF at ¶ 114. Plaintiff testified

that Bush, an African-American employee, would sign in for Hite so he would not appear to be late in the Company records. Def. SMF at ¶ 116; Pl. Dep. at 211. According to Defendant, the Company was never made aware that Bush would sign in for Hite. Def. SMF at ¶ 117. Plaintiff contends that McCarthy signed the time cards, even when Bush would "pencil in" the start times of Hite, contrary to Company policy. Pl. Resp. SMF at ¶ 117.

With respect to these allegations, the Court also finds that Plaintiff has failed to present a *prima facie* case of race discrimination. Viewing the evidence in the light most favorable to Plaintiff, his allegations show at most that the Company did not always strictly enforce its attendance policy, at least with respect to Hite. But he has not shown that the Company took any adverse action against him, or any other African-American employee, with respect to the attendance policy, and that Hite received more favorable treatment even after committing the same attendance infractions.

Plaintiff also contends that Caucasian employees were allowed to smoke cigars with McCarthy while on the clock. Def. SMF at ¶ 133; Pl. Dep. at 213. According to Plaintiff, McCarthy smoked cigars with Caucasian employees while they were working on overtime. Def. SMF at ¶ 73. But Plaintiff admits that he never asked McCarthy to smoke cigars with him, that he does not even smoke cigars, and he was

not sure if the other employees who smoked cigars with McCarthy were invited by McCarthy to smoke cigars or asked McCarthy. Def. SMF at ¶ 134; Pl. Dep. at 149. After CMSI's July 2011 investigation, CMSI banned smoking cigars on Company time. Def. SMF at ¶ 135. Plaintiff contends, however, that Fox and Hite continued to smoke cigars inside the maintenance bay until 2014. Pl. Resp. SMF at ¶ 135.

The Court finds that Plaintiff has failed to present a *prima facie* case of race discrimination based on these allegations regarding the cigar smoking. He does not allege that he requested permission to smoke cigars while on the job, but was denied. Thus, he has failed to present evidence that he was subjected to an adverse employment action, if being denied the opportunity to smoke cigars could even be considered an adverse employment action. For all these reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to the Plaintiff's claim of race discrimination based on unequal issuance of disciplinary actions, and the alleged favoritism shown white employees with regard to cigar smoking.

### E.   PLAINTIFF'S CLAIMS OF RETALIATION

In addition to his claims of race discrimination, Plaintiff also asserts a claim against Defendant CMSI under § 1981 for unlawful retaliation. Plaintiff alleges that

Defendant retaliated against him after he filed an EEOC charge alleging race-based discrimination on May 2, 2011.

The Supreme Court has held that § 1981 encompasses claims of race-based retaliation as well as claims of race discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *see also Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009). As discussed above, when a plaintiff has asserted a claim under § 1981 as a remedy for employment discrimination, the elements required to establish a claim under § 1981 are ordinarily the same as those required for a Title VII claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (*citing Patterson v. McClean Credit Union*, 491 U.S. 164 (1989)); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

In general, proof of unlawful retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order

to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

Plaintiff claims that, after he filed his EEOC charge in May of 2011 alleging that Defendant had discriminated against him on the basis of his race, Defendant retaliated against him by issuing a disciplinary action to him based on alleged attendance violations, and by denying him a promotion to an Engineer position in 2012. The Court will address each of these claims separately.

1.   *Disciplinary Action in May of 2011*

a.   *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation, a plaintiff must generally show that: (1) he engaged in a protected activity or expression; (2) he received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

(1)   Protected Activity

A plaintiff alleging unlawful retaliation can show that he engaged in a protected act under Title VII through evidence of either "participation" or "opposition." An act of participation ordinarily requires the existence of a Title VII proceeding or investigation. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). On May 2, 2011, Plaintiff filed an EEOC charge alleging race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, which he later amended to include retaliation. Def. SMF at ¶ 62. It is undisputed that Plaintiff engaged in a protected activity when he filed his EEOC charge. Defendant argues,

107

however, that Plaintiff cannot establish a *prima facie* case of retaliation because he has not presented evidence that he received an adverse employment action, or that there was a causal link between the protected expression and the adverse action.

(2)     Adverse Employment Action

The Eleventh Circuit held in *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998), that, as used in the context of a claim of retaliation, adverse employment actions are not limited strictly to ultimate employment decisions such as a termination or a failure to promote. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998) ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). In *Wideman*, the court found that a series of incidents involving reprimands and other negative treatment of an employee who had filed an EEOC charge could, when taken together, constitute adverse employment actions for the purposes of presenting a *prima facie* case of retaliation. *Id.* Nevertheless, although actions falling short of ultimate decisions may still constitute adverse employment actions, "there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable." *Id.*; *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

Plaintiff argues that Defendant retaliated against him for filing his EEOC charge when it issued him disciplinary actions in May and June of 2011. The evidence indicates that, on May 31, 2011, Plaintiff was assessed 4.5 points under the Company's attendance policy: Plaintiff was given one point for each absence on November 4 and 5, 2010; a half point for being late on February 3, 2011; one point for being late on February 4, 2011; and one point for being late on March 16, 2011. Def. SMF at ¶ 42. Plaintiff argues that, although some of these points were assessed for incidents that happened in 2010, the Defendant did not issue the disciplinary action against Plaintiff until after he filed his EEOC charge on May 2, 2011. On June 22, 2011, Plaintiff was notified of another disciplinary action: he was given one point for his absence on March 19, 2011, one point for being late on May 6, 2011; and a half point for his early dismissal on May 18, 2011. Def. SMF at ¶ 46.

As discussed, under the law of the Eleventh Circuit, for an employment action to be considered an "adverse action," the decision must work a *material* alteration on the terms of employment. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way"); *see also Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016-17 (8th Cir. 1999) ("Minor

changes in duties or working conditions that cause no materially significant disadvantage do not meet the standard of an adverse employment action"). The Supreme Court has held that an adverse action cannot be merely a trivial annoyance but must be significant in order to be actionable as unlawful retaliation under Title VII. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006).

Ordinarily, a disciplinary action such as a written warning or a negative performance appraisal is not considered an adverse employment action unless it has a significant material effect on an employee's pay or conditions of employment. *See Davis*, 245 at 1242 (plaintiff cannot recover on a Title VII claim based "only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations" because negative job evaluations, unless accompanied by a demotion or loss in pay, are not tangible adverse employment actions). Defendant argues that, because it is undisputed that Plaintiff did not receive any demotion or loss in pay as a result of the disciplinary action, he has failed to show that it could be considered an adverse employment action for the purpose of his retaliation claim. Plaintiff, on the other hand, argues that, because an accumulation of points under the attendance policy could eventually lead to termination, his disciplinary action was an adverse employment action.

The Court finds that, because the disciplinary action was not accompanied by any material effect on the Plaintiff's job, *i.e.*, it did not result in any demotion or loss of pay, it was not an adverse employment action for the purpose of his retaliation claim. Furthermore, even assuming that it could be considered an adverse employment action, because it could have hypothetically led to the termination of Plaintiff's employment if he accumulated enough points,[15] the Court finds that Defendant would still be entitled to summary judgment on that claim because the Defendant has presented evidence that it had a legitimate reason for issuing the disciplinary action and Plaintiff has failed to cite to sufficient evidence in the record establishing that Defendant's reasons were a pretext to disguise an intent to retaliate against Plaintiff for filing an EEOC charge.

(3)   Causal Link

For the third and final element of a *prima facie* case of retaliation, Plaintiff must establish that there is a causal link between the protected activity and the adverse employment action. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of

---

[15] According to Defendant, the points "roll off" after twelve months; thus, the Plaintiff's points were never used against him. *See* Def. Reply Br. [37] at 11.

discrimination, shifting the burden of persuasion to the defendant." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985); *see also Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991). Rather, Plaintiff can satisfy the third element merely by presenting evidence that the protected activity and the subsequent adverse employment action are not totally unrelated. *Simmons*, 757 F.2d at 1189; *see also Hairston*, 9 F.3d at 920; *Weaver*, 922 F.2d at 1525.

In order to establish a causal connection between protected conduct and an adverse employment action, however, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("A plaintiff satisfies this element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show that the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.") (emphasis added). As the Eleventh Circuit has stated, this requirement "rests upon common

112

sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The defendant's awareness of the protected statement, however, may be established by circumstantial evidence. *Goldsmith*, 996 F.2d at 1163.

Absent other evidence of a causal link, a plaintiff may establish an inference of causation merely by showing that he suffered the adverse action shortly after he engaged in the protected activity. *Higdon*, 393 F.3d at 1220; *Bass v. Board of County Comm., Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001); *Brungart*, 231 F.3d at 798. For a plaintiff to establish such a link by mere temporal relationship, however, the challenged decision must follow almost immediately after the protected expression to support the logical inference that the two events were related. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted).

The Eleventh Circuit has held that a gap of three months or more between the protected activity and the challenged personnel action is too long to support the inference that the two events were connected. *See Thomas v. Cooper Lighting, Inc.*,

506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period does not rise to the level of "very close" to support an inference of a causal link); *Higdon*, 393 F.3d at 1221 (three-month period does not allow a reasonable inference of causation); *see also Conner v. Schnuck Markets, Inc.*, 123 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months between protected activity and termination did not support inference of casual connection); *Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997) (passage of six months between plaintiff's complaint and firing insufficient, without more, to establish causation); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four-month gap between filing discrimination complaint and receipt of disciplinary letter did not give rise to inference of causal relation).

In this case, Plaintiff's protected activity giving rise to his retaliation claim was his EEOC Charge filed on May 2, 2011. Defendant contends that it received notice of the Plaintiff's EEOC charge in mid-to-late May of 2011. Def. SMF at ¶ 63. Plaintiff was then given a disciplinary action based on his alleged attendance violations on May 31, 2011, and another on June 22, 2011. Defendant argues that the Plaintiff cannot present evidence of a causal link between his protected activity and the disciplinary actions because, it argues, "he cannot identify any comparator employee who (like him) was late to work or failed to provide a doctor's note for his absences and was not given any points." Def. Br. at 18. Contrary to Defendant's argument, the Plaintiff is

not required to present evidence of a relevant comparator for the purpose of his retaliation claim. Under the law of the Eleventh Circuit, as discussed above, temporal proximity alone can provide evidence suggesting a causal link. In this case, because the Plaintiff has presented evidence that his disciplinary action occurred within one month of his protected activity, if his disciplinary action were considered an adverse employment action, the temporal proximity between the filing of his EEOC charge on May 2, 2011, and the disciplinary action on May 31, 2011, would provide circumstantial evidence of a causal link.

Nevertheless, even if the Plaintiff presented sufficient evidence to establish a *prima facie* case of retaliation, the undersigned finds that Defendant is entitled to summary judgment because it has presented evidence that it had a legitimate reason for issuing the disciplinary actions against the Plaintiff and Plaintiff has failed to present evidence that Defendant's reasons were a pretext to disguise unlawful retaliation.

### b.    Defendant's Legitimate Reason

Defendant contends that it had legitimate reasons for issuing the disciplinary actions to the Plaintiff for violations of the attendance policy. It is undisputed that CMSI has an attendance policy in its employee handbook that requires employees who miss a scheduled shift to provide a doctor's note for absences related to personal

illness, health related appointments, injury or disability, and requires employees to arrive to work on time and stay for their whole shift. Def. SMF at ¶ 31. CMSI enforces its attendance policy through the use of a point system. Def. SMF at ¶ 32. Employees who fail to provide a doctor's note when they miss a scheduled shift are assessed one point; employees who are fewer than 15 minutes late to work are assessed one-half of a point; and employees who are more than 15 minutes late to work are assessed one point. Def. SMF at ¶ 33.

Defendant contends, that, on Thursday and Friday, November 4 and 5, 2010, the Company records reflect that Plaintiff did not come in to work as scheduled, did not submit a doctor's note excusing his absence, and did not take vacation time; instead, the records show sick days for Plaintiff on November 4 and 5, 2010. Def. SMF at ¶ 36. On Thursday and Friday, November 18 and 19, 2010, Company records reflect that Plaintiff took a personal day and scheduled November 20, 2010 as a vacation day. Def. SMF at ¶ 37. On February 3, 2011, Plaintiff was eight minutes late for work due to an accident on the highway. Def. SMF at ¶ 38. On February 4, 2011, Plaintiff was one hour and 41 minutes late to work due to auto issues. Def. SMF at ¶ 39. On March 16, 2011, Plaintiff did not come in to work as scheduled due to illness and did not provide CMSI with a doctor's note for the absence. Def. SMF at ¶ 40.

In 2011, when it came to Mihalco's attention that employees were not being issued points for their attendance infractions, CMSI performed an attendance audit of its employees at the Atlanta site. Def. SMF at ¶ 41. After Akiko Yoshida, the Atlanta site HR Assistant, reviewed Plaintiff's attendance record, on May 31, 2011, Plaintiff was given one point for each absence on November 4 and 5, 2010; a half point for being late on February 3, 2011; one point for being late on February 4, 2011; and one point for being late on March 16, 2011. Def. SMF at ¶ 42.

Defendant contends further that, on March 19, 2011, Plaintiff did not come in to work as scheduled due to illness and did not provide CMSI with a doctor's note for the absence. Def. SMF at ¶ 43. On May 6, 2011, Plaintiff was 47 minutes late to work because he helped another employee who was having car trouble come to work. Def. SMF at ¶ 44. On May 18, 2011, Plaintiff left work early with a supervisor's approval due to a migraine but did not provide CMSI with a doctor's note for his early dismissal. Def. SMF at ¶ 45. After Yoshida reviewed Plaintiff's attendance record, on June 22, 2011, Plaintiff was given one point for his absence on March 19, 2011, one point for being late on May 6, 2011; and a half point for his early dismissal on May 18, 2011. Def. SMF at ¶ 46.

The Court thus finds that Defendant has presented sufficient evidence that it had a legitimate reason for issuing the disciplinary actions to Plaintiff for his attendance violations.

c.      Pretext

In Plaintiff's brief, he does not address the issue of pretext on this claim. *See* Pl. Br. at 19-20. He argues only that he has presented a *prima facie* case of retaliation based on the disciplinary actions. *See id.* Plaintiff argues, however, that there is a genuine dispute of fact over whether he took sick leave on November 4 and 5, 2010, as the Defendant claims, or whether he was out on an approved vacation leave, as he claims. *See id.* at 20 n.11.

Significantly, the Plaintiff does not dispute any of the Defendant's contentions regarding the Plaintiff's other attendance violations. Plaintiff admits that he came to work late on February 3 and 4, 2011, and May 6, 2011; did not come into work as scheduled and did not provide a doctor's note for the absences on March 16 and 19, 2011; and left work early with approval but did not provide a doctor's note for his early dismissal on May 18, 2011. Def. SMF at ¶ 193. His only dispute with the Defendant over his alleged attendance violations appears to be the points he was assessed for November 4 and 5, 2010. Plaintiff claims that he scheduled vacation time on November 4 and 5, 2010, which had been approved by McCarthy, but that the

118

vacation leave was mistakenly recorded by "HR Akito" as sick leave. Def. SMF at ¶ 194; Pl. Resp. SMF at ¶¶ 36, 194; Pl. Decl. at ¶ 10.

Plaintiff does not dispute the Defendant's contention that the Company records indicate that he was out on sick leave on November 4 and 5, 2010, and he states that Yoshida "placed me on sick leave for November 4 and 5, 2010 for reasons only known to her." Pl. Decl. at ¶ 9. Thus, Plaintiff apparently concedes that Yoshida made this mistake at the time that the leave was recorded in November of 2010, several months before the Plaintiff filed his EEOC charge in May of 2011. Plaintiff has not cited to any evidence in the record indicating that Yoshida changed his attendance records after he filed his EEOC charge in May of 2011.

In any event, even viewing the evidence in the light most favorable to Plaintiff, there is no evidence from which a rational factfinder could infer that the Defendant issued a disciplinary action to Plaintiff based on an alleged intent to retaliate against him for filing an EEOC charge. Other than the dispute regarding Plaintiff's leave on November 4 and 5, 2010, Plaintiff admits that he was absent or tardy on the days for which he was assessed points for attendance violations. The dispute over Plaintiff's leave on November 4 and 5, 2010 suggests at most that Yoshida made an error in the Plaintiff's records in November of 2010, and Plaintiff does not allege, nor has he cited to any evidence in the record, that Yoshida made any change to his records after the

119

Plaintiff filed an EEOC charge several months after the incident occurred. *See* Pl. Decl. at ¶¶ 9-10 (stating that Yoshida placed him on sick leave on November 4 and 5, 2010).

Moreover, even assuming that Plaintiff is correct that Yoshida made an error when she placed him on sick leave on November 4 and 5, 2010, rather than the vacation time he claims that McCarthy had approved, this error by the Defendant does not constitute pretext. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("a Plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, so long as the reason is one that might motivate a reasonable employer") (internal quotes omitted); *Shealy v. City of Albany*, 89 F.3d 804, 806 n.6 (11th Cir. 1996) (court "does not sit as a sort of 'super personnel officer'. . . correcting what the judge perceives to be poor personnel decisions"); *see also Rojas v. State of Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002) (Title VII does not permit courts to sit in judgment of "whether a business decision is wise or nice or accurate"); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) ("[f]ederal courts do not sit to second-guess the business judgment of employers"); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (the court does "not sit as a super-personnel department that reexamines an entity's business decisions . . . no matter how mistaken").

As the Eleventh Circuit has stated, an employer may make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984). Thus, even if the Plaintiff established that Defendant made an error when it assessed points against the Plaintiff for being out on sick leave on November 4 and 5, 2010, that error by itself is not sufficient to constitute pretext. Plaintiff has not pointed to any evidence suggesting that Defendant had any intent to retaliate against the Plaintiff for filing an EEOC charge, nor has he cited to any record evidence indicating that the Defendant's proffered reason was a mere pretext to disguise an intent to retaliate against the Plaintiff. Accordingly, the Defendant is entitled to summary judgment on the Plaintiff's claim of retaliation based on the disciplinary actions issued against him in May and June of 2011, and the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to this claim.

2.     *Failure to Promote in 2012*

Plaintiff argues further that Defendant retaliated against him for filing an EEOC charge when it denied him the promotion to the Engineer Position in 2012.

121

a.   *Prima Facie* Case

As discussed above, in order to establish a *prima facie* case of retaliation, a plaintiff must show that he engaged in a protected activity, he received an adverse employment action, and there was a causal link between the protected expression and the adverse action. Defendant argues that the Plaintiff cannot establish a *prima facie* case of retaliation based on the denial of the promotion in 2012, because he has failed to present any evidence of a causal link between his filing an EEOC charge in May of 2011 and the denial of the promotion in March of 2012.

The evidence reflects that the Plaintiff filed his EEOC charge on May 2, 2011, and he was notified that he did not receive the promotion to the Engineer position on or about May 29, 2012. Def. SMF at ¶ 80. It is undisputed that, in March of 2012, Defendant made the decision to promote Nelson, who is African-American, for the Engineer position because he has an associate's degree in electronics, 28 years of electrical mechanic experience, and supervisory experience from his previous job. Def. SMF at ¶ 78. Although Plaintiff admits that Nelson was qualified for the position, he contends that he was more qualified, and that Nelson received the promotion over Plaintiff because Plaintiff had filed an EEOC charge while Nelson had not. Pl. Resp. SMF at ¶¶ 78-79, 241; Pl. Dep. at 95.

122

Plaintiff does not contend that temporal proximity provides evidence of a causal link. It is undisputed that over a year passed between the Plaintiff's filing his EEOC charge and the Company's decision to select Nelson for the Engineer position instead of Plaintiff in May of 2012. Instead, Plaintiff argues that he has presented evidence of a causal link because "Defendant did not leave plaintiff alone after he filed the charge," and McCarthy "engaged in a pattern of retaliation against plaintiff since he filed the charge: less overtime; written up for occurrences that preceded the EEOC charge; no central control assignment and/or training until after he filed the charge and it was investigated, refusal to stop harassment, 'leave the white boys alone,' shift changing and other acts to 'run the plaintiff off' or at least make him think that his job was in jeopardy." Pl. Br. at 23-24.

The Court finds that none of this evidence constitutes evidence of a causal link between the Plaintiff's EEOC charge and the denial of the promotion to the Engineer position in 2012. First, the Plaintiff has cited to no record evidence supporting his allegation that anyone ever told him that they were trying to "run the plaintiff off." *See* Pl. Br. at 24.[16] Plaintiff also has not presented evidence to substantiate his other

---

[16] The Court notes that Plaintiff did not include this allegation in his Response to the Defendant's Statement of Material Facts, and thus it cannot be considered by the Court. Moreover, although Plaintiff cites to his own Declaration in support of this allegation, he does not state in the Declaration that McCarthy or anyone else ever said to him that they wanted to "run the plaintiff off." *See* Pl. Decl. [34-2].

allegations that there was a "pattern of retaliation." For example, although Plaintiff argues that McCarthy's comment to him to "leave the white boys alone" is evidence that McCarthy harbored an intent to retaliate against him, the evidence indicates that McCarthy made that comment long before Plaintiff filed his EEOC charge. Plaintiff testified that McCarthy made that statement to him in 2010, in reference to Caucasian employees allegedly complaining to McCarthy about Plaintiff's sending two African-American employees to central control to train. Def. SMF at ¶ 84; Pl. Dep. at 136-39. Thus, McCarthy's statement to Plaintiff to "leave the white boys alone" cannot be considered evidence that McCarthy engaged in a "pattern of retaliation."

None of the Plaintiff's allegations regarding a "pattern of retaliation" suggests any causal link between the Plaintiff's EEOC charge and the Company's decision to promote Nelson to the Engineer position instead of Plaintiff in 2012. Defendant has presented evidence that it made the decision to promote Nelson to the Engineer position because he has an associate's degree in electronics, 28 years of electrical mechanic experience, and supervisory experience from his previous job, and Plaintiff has not presented any evidence to dispute these proffered reasons. Instead, he admits that Nelson was qualified for the position.[17]

_____

[17] For this reason, the undersigned finds that, even if Plaintiff had presented evidence of a causal link between his protected activity and the adverse employment action, Defendant would still be entitled to summary judgment because Plaintiff has

In sum, the undersigned finds that Plaintiff has failed to present evidence of any causal link between the filing of his EEOC charge and the Company's failure to promote him to the Engineer position in 2012. Thus, the Defendant is entitled to summary judgment on the Plaintiff's claim of retaliation based on the denial of the promotion in 2012, and the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to that claim.

F.      PUNITIVE DAMAGES

In the Complaint, Plaintiff requests punitive damages in addition to compensatory damages. *See* Compl. at ¶ 30(c). Defendant has moved for summary judgment on this request. Because the undersigned is recommending that the Court deny the Defendant's Motion for Summary Judgment on one of Plaintiff's substantive claims, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [29] be **DENIED** as to Plaintiff's request for punitive damages. Should this action proceed to trial, Defendant may renew its argument regarding punitive damages at that time.

---

failed to present sufficient evidence that Defendant's reasons for selecting Nelson for the position were pretextual.

125

## III.   RECOMMENDATION

For the above reasons, **IT IS RECOMMENDED** Defendant's Motion for Summary Judgment [29] be **GRANTED IN PART, DENIED IN PART**.

**IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [29] be **DENIED** as to Plaintiff's claim that Defendant discriminated against him on the basis of his race when it failed to promote him to Engineer in 2011, and **DENIED** as to Plaintiff's request for punitive damages.

**IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [29] be **GRANTED** as to all of Plaintiff's remaining claims, including Plaintiff's claims of race discrimination based on a hostile work environment, denial of overtime pay in 2011, denial of the opportunity to train in central control prior to 2011, denial of a promotion in 2012, failing to pay him for clocking in early, issuing unequal disciplinary actions for attendance and performance violations, and allowing white employees to engage in cigar smoking, and the Plaintiff's claims of retaliation based on the disciplinary action in 2011 and the denial of a promotion in 2012.

**IT IS SO RECOMMENDED** this 24th day of June, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE